FILED
United States Court of Appeals
Tenth Circuit

May 8, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

WINSLOW FRIDAY,

Defendant-Appellee,

NORTHERN ARAPAHO TRIBE,

Amicus Curiae.

No. 06-8093

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 2:05-CR-00260-WFD)**

---

Kathryn E. Kovacs, United States Department of Justice, Environment and Natural Resources Division, Appellate Section (Elizabeth Ann Peterson, Elinor Colbourn, United States Department of Justice, Environment and Natural Resources Division, Appellate Section; Matthew J. McKeown and Ronald J. Tenpas, Acting Assistant Attorney Generals, Washington, D.C.; Matthew H. Mead, United States Attorney, John R. Green, Acting United States Attorney and David Kubichek and Stuart S. Healy, III, Assistant United States Attorneys, District of Wyoming, Casper, Wyoming, with her on the briefs), for Plaintiff-Appellant.

John T. Carlson, Assistant Federal Public Defender, Denver, Colorado (Raymond P. Moore, Federal Public Defender, Denver, Colorado and Robert R. Rogers, Assistant Federal Public Defender, Cheyenne, Wyoming, with him on the briefs), for Defendant-Appellee.

Christopher J. Schneider, Baldwin & Crocker, P.C., Lander, Wyoming, for Northern Arapaho Tribe as Amicus Curiae in support of Defendant-Appellee.

---

Before **McCONNELL**, **SEYMOUR** and **EBEL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Winslow Friday, a member of the Northern Arapaho Tribe of Wyoming, shot a bald eagle for use in the tribe's traditional religious ceremony, the Sun Dance. He was charged under federal law with shooting an eagle without a permit, which is forbidden by the Bald and Golden Eagle Protection Act. Mr. Friday responded that the Religious Freedom Restoration Act precludes the government from prosecuting him. After an evidentiary hearing, the district court agreed and dismissed the indictment. We disagree, concluding that the Eagle Act and its regulations are the least restrictive means of pursuing the government's compelling interest in preserving the bald eagle. We therefore reverse and remand the prosecution for trial.

## I. BACKGROUND

### A. The Sun Dance

The Sun Dance is an important religious ritual once common to nearly all of the Plains Indian Tribes. *See* George A. Dorsey, *The Arapaho Sun Dance* 2 (1903); Albert Muntsch, *The Relations Between Religion and Morality Among the*

*Plains Indians*, 4 Primitive Man 22, 25 (1931).  In the last part of the Nineteenth Century, federal officials attempted to suppress the dance because they believed it to be connected with Indian militancy, and some tribes abandoned it.  *See* Clyde Ellis, *"There Is No Doubt . . . the Dances Should be Curtailed": Indian Dances and Federal Policy on the Southern Plains, 1880–1930*, 70 Pac. Hist. Rev. 543, 548–53, 561 (2001); Dorsey, *supra*, at 1–2.  But it has made a comeback, and the Northern Arapaho now perform the dance every year, traditionally after the first thunder of the spring and as late as July.  The details are guarded, and access by outsiders is limited.  Witnesses at the hearing said they could reveal information about the ritual only with the consent of Northern Arapaho tribal elders.

We do know the following:  The ceremony involves a week of preparation, instruction, prayer, and ritual dancing.  Each Sun Dance has a sponsor who is responsible for acquiring the materials needed for the ceremony.  A crucial element of the ceremony is the construction of a building called the "offering lodge," where the tribe makes a number of sacrifices to its deity.  As part of "a protocol that's been handed down from generation to generation," the sponsor is expected to acquire an eagle for the dance.  Aplee.'s Supp. App. (hereinafter "Supp. App.") 139.  The eagle is seen as "a gift of the Creator."  Supp. App. 139.  At one point during the dance, the tribe raises up an offering to the Creator on a pole at the lodge.  This offering contains the tail fan of an eagle.  A Northern Arapaho named Burton Hutchinson testified that the offered eagle represents the

central identity of the tribe and its adherence to tradition. As he put it, "that eagle . . . has a lot of meaning to oversee us every day, every night." Supp. App. 42.

It is important to the tribe that the offered eagle be "pure." Supp. App. 122. This means that the tail may not be reused, and a new eagle must be sacrificed every year. It also means that the eagle must be taken[1] with care. It cannot have died through poison, disease, or electrocution, and it cannot be roadkill. Beyond the central requirement that the eagle be pure, tribal members disputed the most appropriate way to take an eagle for the Sun Dance, offering different accounts of tribal lore and its application today. Nelson White Eagle, the keeper of the sacred pipe of the Northern Arapaho, testified that it was traditional to hide in a small hole on a mountain, and then trap eagles in a coyote hide as they came by. He said that while he personally would not use in the Sun Dance an eagle that had been shot, as Mr. Friday's was, he could not speak for others of the tribe. Mr. Hutchinson testified that the tribe traditionally builds a small den with a hole in the roof, where the tribe's nominated "eagle catcher" places bait on top and waits until an eagle comes. William C'Hair, a member of the Northern Arapaho Language and Culture Commission, testified that it is traditional to feed the eagle until it cannot fly and then flip it over with a pole; if

---

[1] The tribe uses the term "taken," finding it offensive to refer to the eagle as killed. This is also the term used in the Eagle Act. *See* 18 U.S.C. § 668(a).

-4-

the eagle grips the pole tightly, its claws will get stuck and immobilize it. Harvey Spoonhunter testified that "in today's world . . . it is acceptable" to shoot eagles for the Sun Dance. Supp. App. 149.

There are also tribal hunting regulations that forbid the taking of eagles. Interestingly, these make no explicit exception for the Sun Dance, even though the regulations do make exceptions for hunting "male deer and male elk before the Sundance ceremony." Gov't App. 150. However, these regulations may not necessarily be taken to define Northern Arapaho beliefs. The Northern Arapaho share the Wind River reservation with the Shoshone tribe, a relationship that has not always been amicable. *See Shoshone Tribe of Indians v. United States*, 299 U.S. 476, 484–92 (1937). The hunting regulations were jointly enacted by the business councils of the two tribes. Mr. Spoonhunter testified that although the tribe usually obeys the joint regulations as a matter of comity with its co-occupants of the reservation, it does not recognize the regulations as law because they were not endorsed by the Northern Arapaho General Council. At oral argument the Tribe's lawyer informed us that if an eagle were taken for the Sun Dance, Northern Arapaho tribal courts enforcing the joint regulation would recognize a defense under unwritten "traditional law" that "predates the Tribe's existence."

Although the eagle used in the Sun Dance is typically a golden eagle, Mr. Friday's was a bald eagle. Mr. Hutchinson testified that he had "never seen

where they used a bald eagle at a Sun Dance." Supp. App. 28. Mr. C'Hair, however, testified that a bald eagle is used to represent old age, because the eagle's white feathers symbolized white hair. Thus, he said, "when you're an old man, that's when you qualify to use the bald eagle." Supp. App. 112. Mr. Friday is 21 years old, but Mr. C'Hair explained that "the bald eagle will represent the old people of the tribe," not merely the sponsor or his family. Supp. App. 113.

## B. Federal Regulation of Eagle Taking

Both species of eagle are protected by the Bald and Golden Eagle Protection Act (the "Eagle Act"), which criminalizes taking protected birds (or possessing them, dead or alive) without a permit. 16 U.S.C. § 668(a). When it was enacted in 1940, the law applied only to bald eagles, but because golden eagles can sometimes be difficult to distinguish from juvenile bald eagles, the Act was amended in 1962 to include both. Act of June 8, 1940, ch. 278, § 1, 54 Stat. 250, 250–51; Joint Resolution of Oct. 24, 1962, Pub. L. No. 87-884, 76 Stat. 1246. Taking an eagle is punished with a fine up to $5,000 and one year in prison.

In contrast to the federal hostility to the Sun Dance a century ago, Congress and the Fish and Wildlife Service (FWS) now accommodate those Native Americans who need eagles for religious purposes in two ways: the National Eagle and Wildlife Property Repository, and a permitting process. Better known is the Repository, maintained by the FWS in Commerce City, Colorado, just

outside Denver. It is a large warehouse where the government collects and freezes any potentially usable dead eagles or eagle parts it encounters. Some are confiscated contraband; some are the victims of electrocution on power lines; some are roadkill. Eagle parts are distributed by application to registered members of Native American tribes who need them for religious purposes.

The Repository does not work well for those whose religion requires the eagles to be pure. Bernadette Atencio, a government witness who is responsible for supervising the Repository, testified that "[m]ost of the time [the eagles a]re very decomposed." Supp. App. 228. Sometimes they are "full of maggots." Supp. App. 229. She also testified that the Repository will describe the bird to an applicant before sending it to make sure that it is usable, and that the Repository will replace unsatisfactory shipments. However, members of the tribe testified that they received parts from the Repository that were insufficiently pure to be usable in the Sun Dance, and were unable to get satisfactory replacements. One member was sent some type of waterfowl.

Despite these problems, parts from the Repository are in very high demand. The Repository sends out 1700–1800 shipments a year, receives few complaints, and has approximately 4000 requests outstanding. The high demand also means that there are delays. The FWS website currently estimates the wait for a "[w]hole tail" from the Repository to be 3.5 years, which is much longer than the wait for assorted smaller parts. United States Fish and Wildlife Service, Ordering

-7-

Eagle Parts and Feathers from the National Eagle Repository 3 (2007), http://www.fws.gov/forms/3-200-15a.pdf.

Second, and more importantly for this prosecution, Native Americans whose needs cannot be satisfied by the Repository may apply for a permit to "take" a live eagle. 16 U.S.C. §668a; 50 C.F.R. § 22.22. An applicant must be a member of a federally-recognized tribe and must write to the Migratory Bird Permit Office in his region, explaining how many eagles of what species he wishes to take, as well as the tribe and ceremony for which they are needed.

The FWS will grant an application for a religious taking permit only when it "determine[s] that the taking . . . is compatible with the preservation of the bald and golden eagle." 50 C.F.R. 22.22(c). There are two listed criteria for this determination: the likely "direct or indirect effect" of the permit on the eagle population, and whether the applicant is a Native American with a "bona fide" religious use. *Id.* At the hearing, Brian Milsap, the chief of the Division of Migratory Bird Management at the FWS, explained that there is in practice an additional requirement: "special circumstances" must demonstrate that the Eagle Repository "could [not] satisfy the need" for the bird or feathers. Supp. App. 276. If the Repository can satisfy the need, the permit will be denied.

The permit process is used infrequently, and is not widely known. Unsurprisingly, the FWS prefers for those who can to use dead eagles from the Repository because that does not decrease the eagle population. Mr. Milsap

-8-

testified that he knew of only a few permits to take eagles—all golden—that had ever been issued under the Act: two permits issued to the Navajo tribe and one annually-recurring permit granted to the Hopi which permits them to take forty nestling eaglets per year.[2]   So far as he knew, there had never been, in any region, a request to lethally take a bald eagle.

There is also evidence in the record that one FWS employee may have been unaware of the availability of these permits.  Special Agent Doug Goessman, a 20-year veteran of the FWS, testified for the government as an expert in law "enforcement against eagle violations."  Supp. App. 357.  On cross-examination, he stated that he believed "there's no provisions for Native Americans to obtain a permit to kill eagles."  Supp. App. at 368.  On redirect, however, he testified that he was familiar with 50 C.F.R. § 22.22.  When asked if "those regulations actually state that a permit can be obtained for a take?" he replied, "Yes, it can."  Supp. App. 368.

---

[2] The government filed motions asking us to take judicial notice of a number of other permits granted to other applicants, not introduced at the hearing below.  We are not certain that they satisfy Fed. R. Evid. 201(b) and need not consider the extra-record permits in order to resolve this case in the government's favor.  We deny the motions.

## C. The Events of This Case

Winslow Friday lives on the Wind River reservation in Ethete, Wyoming. His cousin,[3] Nathaniel Friday, was chosen in the summer of 2001 to be a sponsor of what turned out to be the 2005 Sun Dance, although it was not settled at that time which year's dance he would sponsor. While it was Nathaniel's responsibility to ensure that the tribe had the eagle it needed for the dance, the Fridays believe that obligation to be familial, so Winslow was responsible for helping however he could. The Fridays had not yet acquired an eagle by the beginning of March 2005, when Winslow saw a bald eagle perched in a tree on the reservation. He concluded that this was the eagle that the Creator had given to the Friday family, and shot it. This eagle was part of the only nesting pair of bald eagles on the reservation at the time, although an unattached eagle, called a floater, appears to have taken its place. The tail of the eagle was used on the offering pole of the 2005 Sun Dance. Mr. Friday never applied for a permit to take an eagle, nor for eagle parts from the Repository. He later testified that he was aware of the Repository, but not of the permitting process.

The shooting was reported to the Bureau of Indian Affairs by Eddie Friday, who lived nearby. FWS agent Roy Brown and a tribal warden named Rawley Friday investigated the incident. After matching tire treads at the shooting to a

---

[3] Winslow Friday refers to Nathaniel as his "brother in the Indian way." Supp. App. 195.

truck owned by Kennan Groesbeck, Warden Friday and Agent Brown questioned him and were eventually led to Winslow.[4]

The government then charged Mr. Friday—by information rather than indictment, because the crime is a misdemeanor—with a violation of the Eagle Act. He moved to dismiss the information under the Religious Freedom Restoration Act (RFRA), arguing that enforcement of the Eagle Act impermissibly burdened his religion. After an evidentiary hearing in which the Northern Arapaho tribe participated as amicus curiae, the district court granted Mr. Friday's motion. The court first found "futility in the application process." Gov't App. 190. Although the court acknowledged that the law makes Mr. Friday eligible for a permit, it noted that very few applications had been submitted, and that the FWS did not engage in outreach or "in any way promote the taking of eagles." Gov't App. 190. From these findings, the court concluded that "it is clear that Defendant would not have been accommodated by applying for a take permit." Gov't App. 191. Having concluded that the permit system was effectively unavailable to Mr. Friday, the court then analyzed the ban under RFRA in what it regarded as an as-applied challenge. It held that the ban—with no permits practically available—substantially burdened Mr. Friday's religion and could not be justified by its relationship to the government's interest in preserving

---

[4] We do not know whether these other Fridays, Rawley and Eddie, are part of Winslow's and Nathaniel's family.

-11-

the eagle population. It found that "considering the recent recovery of the species and that a more significant cause of eagle mortality is electrocution," the government had "failed to demonstrate that its policy of discouraging requests for eagle take permits for Indian religious purposes, and limiting the issuance of such permits to almost none," was permitted by RFRA. The court concluded its order with a strongly-worded criticism of the government:

> It is not the permitting process itself that the Court finds objectionable. Rather, it is the biased and protracted nature of the process that cannot be condoned as an acceptable implementation of the [Eagle Act]. To show deference to the agency's implementation of the permitting process is to honor the hypocrisy of the process. Although the Government professes respect and accommodation of the religious practices of Native Americans, its actions show callous indifference to such practices. It is clear to this Court that the Government has no intention of accommodating the religious beliefs of Native Americans except on its own terms and in its own good time.

Gov't App. 195. The government appealed the order to this Court, asking us to reinstate the prosecution.

## II. ISSUES ON APPEAL

Under the Religious Freedom Restoration Act, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). There is one exception: the government may impose such a burden "only if it demonstrates that application of the burden . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling

-12-

governmental interest." *Id.* § 2000bb-1(b); *see generally Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). Once a defendant shows that applying a statute to him will substantially burden his religion, the government must justify the burden by establishing a sufficiently compelling interest and showing that it could not accommodate religion more without serving that interest less.

The government concedes that Mr. Friday's religious exercise is sincere, and Mr. Friday concedes that the government's interest in protecting the bald eagle is compelling. Thus, we need only decide whether Mr. Friday's religious exercise has been substantially burdened and whether that burden is the least restrictive means of preserving the bald eagle. On appeal, the government does not argue that the availability of frozen parts from the Repository affects either of these inquiries. Because of the Sun Dance's purity requirement, the availability of parts from the Repository neither minimizes the burden imposed on Mr. Friday's religion nor renders the scheme less restrictive than it otherwise would be. This case therefore does not require us to decide issues related to the Repository. *Cf. United States v. Hardman*, 297 F.3d 1116, 1146 (10th Cir. 2002) (en banc) (Hartz, J., concurring) ("We need not, should not, and do not decide in these cases whether RFRA invalidates in any way the operation of the National Eagle Repository."). Instead we consider the combined effect of the requirement

that eagles be taken only with a permit and the regulations making permits available for Native American religious uses.

The first question in applying RFRA is whether the permit requirement—either facially or as applied to Mr. Friday—imposes a "substantial burden" on his religious exercise. This includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). In *Hardman*, we stated that "[t]he eagle feather is sacred in many Native American religions . . . . Any scheme that limits their access to eagle feathers therefore must be seen as having a substantial effect on the exercise of religious belief." 297 F.3d at 1126–27. The record in this case confirms that this is true of Mr. Friday's tribal religion. A religiously pure eagle tail is needed to complete the Sun Dance in accordance with the Northern Arapaho religion. One witness testified that he could not participate in the Sun Dance when he was unable to obtain the needed parts. So a law that limits the Fridays' access to the eagle needed for the ceremony substantially burdens their ability to exercise their religion by sponsoring and taking part in the Sun Dance.

A harder question is whether it substantially burdens Mr. Friday's religion to require him to obtain a permit in advance of taking an eagle. In other words, on the assumption that the permit process would accommodate Mr. Friday's religious needs, is the mere fact that he is required to go through the process a "substantial burden" within the meaning of RFRA? This question is not relevant

-14-

to the argument that the permit process is futile, since that is an argument that permits are effectively not available. Nor is it relevant to Mr. Friday's claim that the FWS has not given sufficient publicity to the permit program, since that argument is premised on the notion that if he had known about the possibility of a permit he might have obtained one. But it is relevant to Mr. Friday's other claims, which challenge the permit requirement itself or the way in which the permit system is administered.

We are skeptical that the bare requirement of obtaining a permit can be regarded as a "substantial burden" under RFRA, at least in this case. Many religious activities, from building a church to homeschooling a child to obtaining peyote for a Native American Church ceremonial, require some form of advance authorization from the state. To be sure, in theory a claimant's beliefs might forbid him from asking the government for permission to take the eagle, perhaps because such a request would fail to treat the eagle as "a gift of the Creator." Supp. App. 139. However, Mr. Friday has not made any such claim. His appellate briefs contain one isolated statement that the requirement that he use the process—regardless of how it operates—is "offensive." Aplee.'s Br. 31. The brief cites no record support for this claim, and we can find none. Below, Mr. Friday never testified that he had any religious objection to using the permit system. His only testimony about the system was that he did not know it existed until he was told of it after the prosecution began. Moreover, the claim seems to

-15-

be contradicted by the argument, made at length in his brief, that he was disadvantaged by the federal government's failure to publicize the existence of the permit program. If the mere obtaining of a permit were offensive to his religion, the failure of the government to inform him of this option would not be an injury. Without any evidence that Mr. Friday's religious tenets are inconsistent with using an application process, we cannot find a substantial burden under this theory.

We nonetheless will consider Mr. Friday's challenges to the permit process. Because we conclude that the permit process is a reasonable accommodation of Mr. Friday's religious beliefs and is narrowly tailored to achieve the government's compelling purposes, as RFRA requires, we need not rest our decision on the lack of a substantial burden.

The district court found "futility in the application process," and concluded that RFRA required the government to accommodate Mr. Friday's religious beliefs with a non-futile process. Gov't App. 190. On appeal, Mr. Friday argues that this conclusion should be affirmed, but he also makes several additional arguments for affirming on alternative grounds. For one, he makes a facial challenge to the permit requirement, arguing that the government has not carried its burden of showing that there is a need for a permit system at all. He also makes three as-applied challenges. First, he argues that the permit system does not function well—that permits are unlikely to issue, may take too long, and are

-16-

likely to come only subject to conditions unacceptable to the tribe. Second, he argues that the permit system is shrouded in unjustifiable secrecy and that RFRA requires the FWS to engage in outreach about the program. Third, he argues that electric power lines also kill eagles in violation of the Eagle Act, and that RFRA forbids the government from criminally prosecuting religiously-motivated violations without doing the same to the electric companies. Some of these additional arguments were discussed in passing by the district court, but none was a ground for its holding.

Before proceeding to the merits, we must confront several procedural issues. First, we must determine the standard of review. Then we must consider the rules for as-applied and facial challenges, and determine which challenges Mr. Friday may bring, given that he did not apply for a permit.

### III. PROCEDURAL ISSUES

#### A. Standard of Review

Ordinarily, a district court's order dismissing an indictment is reviewed for abuse of discretion, but if the dismissal is based on the court's "interpretation of governing statutes," we review it de novo. *United States v. Thompson*, 287 F.3d 1244, 1248–49 (10th Cir. 2002) (citing *United States v. Wood*, 6 F.3d 692, 694 (10th Cir. 1993)). Although Mr. Friday was prosecuted by information rather than by indictment, we can think of no reason—and the parties have offered none—that the standard of review should differ. The district court's order in this

case was based on its interpretation of RFRA, so our review of the decision as a whole is de novo.

In *United States v. Hardman*, this Court, sitting en banc, held that whether a governmental interest is compelling within the meaning of RFRA is a question of law. 297 F.3d 1116, 1127 (10th Cir. 2002). We did not decide whether the least-restrictive-means question is one of law or fact. We now conclude, as other circuits have, that both prongs of RFRA's strict scrutiny test are legal questions. *See United States v. Vasquez-Ramos*, ___ F.3d ___, Nos. 06-50553 & 06-50694, 2008 WL 962092, at *2 (9th Cir. Apr. 10, 2008) (per curiam); *Lawson v. Singletary*, 85 F.3d 502, 511–12 (11th Cir. 1996) (per curiam); *Christians v. Crystal Evangelical Free Church (In re Young)*, 82 F.3d 1407, 1419 (8th Cir. 1996), *vacated & remanded*, 521 U.S. 1114 (1997) (mem.), *reinstated in relevant part*, 141 F.3d 854, 856 (8th Cir. 1998); *see also Hovenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005) (same conclusion under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*). It is logical to regard RFRA's least-restrictive-means test as an issue of law because the statute explicitly calls for the application of prior First Amendment doctrine. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (citing 42 U.S.C. § 2000bb(b)(1)). In First Amendment cases, application of the least-restrictive-means (or "narrow tailoring") test to a given set of facts is well understood to be a question of law. *E.g.*, *Am. Target Adver.,*

*Inc. v. Giani*, 199 F.3d 1241, 1249 (10th Cir. 2000); *United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992) ("Whether the regulation meets the 'narrowly tailored' requirement is of course a question of law . . . .").

Beyond its resolution of these aspects of the RFRA test, the district court offered a number of observations about the unsatisfactory functioning of the regulatory scheme, such as the "biased and protracted nature of the process," the government's "callous indifference" to the Northern Arapaho's needs, and the "futility [of] the application process." Gov't App. 190, 195. In the ordinary case, it is possible that these conclusions would be characterized as factual. Although the Federal Rules of Criminal Procedure contain no provision like Federal Rule of Civil Procedure 52(a), judge-found facts in criminal cases (unrelated to guilt) are generally reviewable only for clear error. *See Maine v. Taylor*, 477 U.S. 131, 145 (1986) (a federal criminal appeal, despite its caption); *Hardman*, 297 F.3d at 1120 (citing *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001)).

However, assessments of this sort are better seen as constitutional facts, subject to our "independent examination." *See Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)); *see generally* Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229 (1985). That is the lesson of *Bose*, a First Amendment case where the Supreme Court concluded that the strictures of Federal Rule of Civil Procedure 52(a) did not apply to a

district court's conclusion that an alleged libeler had "actual malice" because the determination was a "First Amendment question[] of constitutional fact."  466 U.S. at 508 n. 27 (internal quotation marks omitted).  Subsequent cases have applied *Bose* well beyond the narrow context of constitutional defenses to libel. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston.*, 515 U.S. 557, 567–68 (1995) (expressive association); *Rankin v. McPherson*, 483 U.S. 378, 385–86 & n.9 (1987) (public employee speech); *Homans v. City of Albuquerque*, 366 F.3d 900, 904 (10th Cir. 2004) (campaign finance reform); *Utah Licensed Bev. Ass'n v. Leavitt*, 256 F.3d 1061, 1067–68 (10th Cir. 2001) (liquor advertising); *Wells v. City & County of Denver*, 257 F.3d 1132, 1146–47 (10th Cir. 2001) (Winter Solstice display); *Am. Target Adver.*, 199 F.3d at 1247 (charitable solicitations); *Brown v. Palmer*, 915 F.2d 1435, 1441 (10th Cir. 1990) (public fora); *see* Monaghan, 85 Colum. L. Rev. at 241 ("[*Bose*] made clear that this requirement is not a special rule for public figure defamation cases.").

The *Bose* rule also logically extends to appellate review under RFRA.  The statute asks courts to draw on constitutional doctrines developed under the Free Exercise Clause.  *O Centro*, 546 U.S. at 430–31.  When deciding free exercise claims other courts apply *Bose* review.  *See United States v. Israel*, 317 F.3d 768, 770 (7th Cir. 2003)*; Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 156–57 (3d Cir. 2002); *New Life Baptist Church Acad. v. Town of E. Longmeadow*, 885 F.2d 940, 941–42 (1st Cir. 1989); *Murphy v. I.S.K.Con. of New*

*England, Inc.*, 571 N.E.2d 340, 345 (Mass. 1991). Although this Circuit has not yet considered whether *Bose* extends to the Free Exercise Clause, we have already applied *Bose* review not only to a litany of free speech claims but also to analysis under the Establishment Clause. *See Synder v. Murray City Corp.*, 159 F.3d 1227, 1230 n.7 (10th Cir. 1998) (en banc). We see no reason for free exercise to be left behind. Freedom of religion, no less than freedom of speech, is a promise of the "First Amendment . . . essential to the common quest for truth and the vitality of society as a whole." *Bose*, 466 U.S. at 503–04.

There is one more complication: the *Bose* opinion does not make clear whether its more searching review—whose purpose was to avoid "a forbidden intrusion" on First Amendment rights, *id.* at 499 (internal quotation marks omitted)—applies symmetrically to district court findings that favor as well as disfavor the First Amendment claimant. *See* Monaghan, 229 Colum. L. Rev. at 245–46 (noting the unresolved issue); Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases*, 107 Yale L.J. 2431, 2441–43 (1998) (endorsing the symmetric application of *Bose*). The circuits have long been split on this issue. *See Don's Porta Signs, Inc. v. City of Clearwater*, 485 U.S. 981 (1988) (White, J., noting split and dissenting from denial of certiorari). Although we have never explained why, this Circuit has applied *Bose* even when First Amendment claims prevailed below, and thus taken the side of symmetry. *See Revo v. Discipl. Bd. of Supreme Court*, 106 F.3d

929, 932 (10th Cir. 1997); *Hardin v. Santa Fe Rptr., Inc.*, 745 F.2d 1323, 1326 (10th Cir. 1984). We are bound to this approach, and thus conclude that when faced with an appeal by either side under RFRA we must engage in "independent review . . . that cannot be delegated to the trier of fact." *Bose*, 466 U.S. at 501. Of course, the special *Bose* rule applies only to "constitutional facts" and not to the basic historical facts upon which the claim is grounded, which are subject to the usual "clearly erroneous" standard of review. *Hardman*, 297 F.3d at 1120; *Saye v. St. Vrain Valley Sch. Dist. RE-1J*, 785 F.2d 862, 865 (10th Cir. 1986).

## B. Scope of Review

Mr. Friday did not apply for a permit to take an eagle. Under well-established precedent,[5] this means that he may not raise arguments based on burdens on his religion that *might have* occurred, or *might have* been averted, if he had applied. These include his claims that the process might have taken too long, that he might have been wrongfully denied a permit even if he was entitled to one, or that the FWS might have imposed conditions on the permit that are religiously objectionable. The government does not dispute (and we agree) that Mr. Friday is permitted to argue that the process contains so many obstacles that it would effectively have been futile for him to apply for a permit. The

---

[5] *United States v. Hardman*, 297 F.3d at 1121; *United States v. Baugh*, 187 F.3d 1037, 1041–42 (9th Cir. 1999); *United States v. Hugs*, 109 F.3d 1375, 1378 (9th Cir. 1997) (per curiam); *United States v. Thirty Eight (38) Golden Eagles or Eagle Parts*, 649 F. Supp. 269, 274 (D. Nev. 1986).

government also agrees that Mr. Friday is permitted to bring any facial challenges he may have to the Eagle Act permitting process under RFRA. A facial challenge is one that contends the statute is impermissible in all, or at least the "vast majority[,] of its intended applications." *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 n.5 (10th Cir. 2006).[6] The government argues, however, that because he did not apply for a permit, Mr. Friday may not bring as-applied challenges to the permit process.

We agree with the government, but only insofar as Mr. Friday challenges potential problems with the permitting process that did not occur and therefore did not affect him. A plaintiff may challenge a statute or regulation on an as-applied basis "only insofar as it has an adverse impact on his own rights." *County Court of Ulster County v. Allen*, 442 U.S. 140, 155 (1979); *see Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973); *United States v. Mendes*, 912 F.2d 434, 439–40 (10th Cir. 1990). Because he did not apply for a permit, Mr. Friday cannot complain of the delay he might have experienced, short of futility, if he had applied. Any delay in the permitting process (even if he could prove, based on the experience of others, that it would likely have been excessive) did not

_____

[6] In *Doctor John's*, we left undecided whether a plaintiff making a facial challenge must go so far as to "establish that *no set of circumstances* exists under which the Act would be valid." 465 F.3d at 1157 n.5 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Because Mr. Friday fails to show that the Eagle Act is forbidden by RFRA in the vast majority of its applications, we also do not decide whether he needs to go further.

affect him. Nor may he argue that he might have been improperly denied a permit; that did not happen. Unless the permitting process is so ensnarled in delay and maladministration that the entire process is effectively futile—a claim we consider on the merits below—adjudication of such complaints must await a case involving someone who applied for a permit and experienced unreasonable delay or improper denial.

One of Mr. Friday's as-applied challenges requires further discussion. The regulations state that "[b]y accepting [a] permit, the permittee consents to and shall allow entry by agents or employees of the Service upon premises where the permitted activity is conducted at any reasonable hour. Service agents or employees may enter such premises to inspect the location . . . and any wildlife . . . kept under authority of the permit." 50 C.F.R. § 13.21(e)(2); *see also id.* § 13.47. If construed to allow FWS agents to attend the offering-lodge ceremony at the Sun Dance, Mr. Friday contends, this condition would violate the sacred nature of the ritual. Because this condition, unlike delay or improper denial, is based on the text of the Code of Federal Regulations, it might be regarded as a necessary element in the permit process, and thus facially applicable even though he did not apply for a permit.[7]

---

[7] The only other potential condition Mr. Friday challenges is the rule that anyone convicted of a felony violation of the Eagle Act is disqualified from receiving a permit. 50 C.F.R. § 13.21(c)(1). So far as the record reveals, Mr. Friday has no felony record, and even this prosecution charges him only with a

(continued...)

-24-

We disagree, as the provision has no effect on Mr. Friday's rights in this matter. Mr. Friday testified that he did not know about the permitting scheme until long after he took the eagle. This shows that the existence of this provision could not have influenced Mr. Friday's decision not to apply for a permit. Moreover, it is entirely possible under the language of the regulation that the FWS would be satisfied by the right to inspect the eagle at an acceptable time before or after the ceremony; we do not know. The regulation states that the inspection must be conducted at a "reasonable hour"; for all we know this might be construed by the FWS as requiring it to respect the privacy of sacred proceedings, assuming that is feasible. Even if the provision turns out to be problematic under RFRA, moreover, it seems unlikely that the remedy would be to allow a totally unpermitted taking. Should the FWS insist on an inspection that would violate tribal religious beliefs, an affected person or tribe could bring an as-applied claim under RFRA specifically targeted to the religiously offensive condition. It would be inappropriate for us to reach these various questions on the basis of speculation. Because Mr. Friday did not apply for a permit and thus did not receive a permit with any obnoxious conditions, we cannot decide the legitimacy under RFRA of hypothetical conditions that might have been attached.

---

[7](...continued)
misdemeanor. Thus, this provision does not affect him at all.

On the other hand, some aspects of the permitting scheme *have* been applied to him. Specifically, Mr. Friday challenges the lack of outreach for the permit program, which affected him because he did not know about the program, and the government's decision to prosecute him rather than an electric company that might cause the same harm, which affected Mr. Friday because he is being prosecuted. We will therefore consider these as-applied challenges, along with the claim of futility and the facial challenge, on the merits.

## IV.  FACIAL CHALLENGES

The district court held, and Mr. Friday contends on appeal, that the permit process for takings of eagles for Native American religious purposes is so maladministered as to render it futile. If this is so, the prohibition on eagle takings contained in the Eagle Act is effectively without exception, despite the substantial burden this would place on tribal religious practices. The district court's judgment on this score may therefore be understood as a holding that the Eagle Act violates RFRA in substantially all of its applications to religious uses. This argument is a form of facial challenge. Mr. Friday also raises a facial challenge to the effect that the government has not made a sufficient empirical demonstration of need to require a permit process at all. As explained above, because these are facial challenges to the statute, Mr. Friday is entitled to raise them notwithstanding his failure to apply for a permit.

-26-

## A. Futility

In *United States v. Hardman*, we concluded that Native Americans charged with violating the Eagle Act could make an as-applied challenge to the Act's permitting system without applying for permits if they demonstrated that "it would have been futile . . . to apply for permits." 297 F.3d 1116, 1121 (10th Cir. 2002) (en banc). Citing our decision in *Hardman*, the district court here found "futility in the application process." Gov't App. 190. On this basis the court concluded that the Eagle Act, without an effective permitting system, substantially burdened Mr. Friday's religion in a manner more restrictive than is necessary. Examining the record and reviewing this conclusion de novo, *see Bose*, 466 U.S. at 501, 508, we disagree.

While the district court cited *Hardman* in making its finding of "futility," it also acknowledged that it was really deciding a fundamentally different issue than arose there. In *Hardman*, the defendants were not members of a federally recognized tribe, and were therefore explicitly forbidden from applying because "the application itself require[d] certification of membership." 297 F.3d at 1121; *see* 50 C.F.R. § 22.22(a)(5). In other words, it was legally futile for them to apply because they were legally ineligible. In contrast, Mr. Friday, who is a member of a federally recognized tribe, "does not have the same impediment." Gov't App. 190. He is legally eligible for a permit, and so far as we know may receive one if he applies. The district court nonetheless concluded that it was

-27-

"clear" from the record that Mr. Friday would not have received a permit if he had applied for one, even though he is legally eligible:

> The Defendant and the tribal members testifying on his behalf were not aware of the possibility of obtaining a permit to take an eagle. The statute expressly contemplates a permitting process for the taking of eagles for Indian religious purposes, relying on the Secretary of the Interior to implement regulations to make this accommodation to our Native Americans.  Yet, testimony at the hearing revealed that as recently as 2003, the Secretary had not delegated the authority to process fatal take permits for Indian religious purposes.  The evidence is that prior to 2003, only four such applications were submitted—three were issued and one denied. . . . Although the Fish and Wildlife Service utilizes outreach programs in an attempt to increase the understanding of its Repository program, there are no outreach programs advising Native Americans of the fatal take permitting process. The agency admittedly does not in any way promote the taking of eagles and prefers Native Americans to use the Repository program, despite the program's obvious inadequacies in filling their religious needs.  As a result, very few applications for fatal take permits for Indian religious purposes have been submitted and even fewer granted.  Based upon the agency's conduct in every other respect, it is clear that Defendant would not have been accommodated by applying for a take permit.

Gov't App. 190–91 (footnote omitted).

We do not agree with this reasoning.  It is true that the hearing revealed that the FWS "prefers" those who can to use the Repository, and indeed imposes a rule that permits will be granted only to those whose needs cannot be satisfied by frozen parts from the Repository.  But this did not render it "futile" for Mr. Friday to apply for a permit.  Mr. Friday's need for an eagle that can be guaranteed to be religiously pure might well have led the FWS to conclude that

-28-

the Repository "could [not] satisfy [his] need" for an eagle. Supp. App. 276. Mr. Milsap testified that this is a major factor in deciding to grant an application.

The hearing also revealed that very few people apply for permits and that the FWS engages in no "outreach." Gov't App. 190. This is obscurity, not futility. The record demonstrates that permits are in fact granted. The record reveals no reason to believe that an application to take a single eagle annually for the Sun Dance submitted by the sponsor's family would have been treated any less favorably than the Navajo and Hopi applications to take golden eagles, which have been granted in the past.

It is not clear what the court meant in referring to the Secretary of the Interior's failure to "delegate[] the authority to process fatal take permits." Gov't App. 190. Most likely, the district court was referring to testimony regarding the change in 2003 from regional processing of permit applications to centralized processing in Washington.[8] Mr. Milsap testified that this change was in part because in 2003 the FWS realized that "in actuality the director of the Fish & Wildlife Service had never delegated the authority to issue legal take permits for

---

[8] Brian Milsap testified that eagle-take permits are now processed not regionally, as the regulation appears to contemplate, but in Washington. The record contains a 2003 permit issued to the Hopi that appears to confirm this. The permit's cover page lists only the FWS "Division of Migratory Bird Management, Washington, DC," and an appendix says that "Staff of the Service's Division of Migratory Bird Management in Arlington, Virginia, prepared this recommendation with technical input from Migratory Birds and State Programs staff in Region 2." Gov't. App. 172, 178.

bald or golden eagles to the regional directors." Supp. App. 275. If this is what the district court meant, it did not render the process futile before 2003 or after. Before 2003 regional directors processed permits; now they are processed centrally. This change has no evident effect on Mr. Friday's ability to get a permit. Mr. Friday now argues that because all of the pre-2003 applications discussed at the hearing were received in Region 2—which does not include the Wind River reservation—it is clear that the permitting program only applied to that region. That is not what the regulations say, and since we know of no applications that were received in Mr. Friday's region, we do not know if they would have been denied. In any case, even if there had been problems with regional processing of permits before 2003, it still would not establish futility for Mr. Friday. He took the eagle in 2005 for that year's Sun Dance, two years after the switch to central processing. So far as we know that was ample time to apply for and receive a permit.

Obviously, the district judge was frustrated with what he perceived as undue foot-dragging by the FWS with respect both to fatal take permits and the Repository. This frustration may well be justified, and we hope that the FWS is aware of the problems documented in the hearing below. But the evidence in the record does not come close to demonstrating that the process is so protracted as to be futile. Mr. Milsap testified that the Hopi permit took approximately three months to process the first time; three months would have given the Fridays

ample time before the Sun Dance. He acknowledged that an application for a bald eagle could have presented added legal difficulties when the eagle was on the "threatened" list, although he added that "[a]dministratively I don't think that's an obstacle." Supp. App. 301. The bald eagle has since been de-listed. Final Rule, Removing the Bald Eagle in the Lower 48 States From the List of Endangered and Threatened Wildlife, 72 Fed. Reg. 37,346 (July 9, 2007) (to be codified at 50 C.F.R. § 17.11(h)). Although there is evidence in the record that one permit application was denied, there is no evidence that this denial was improper, and no evidence regarding other permit applications. We cannot deny the government its authority to enforce a congressionally-enacted criminal statute based on no more evidence than this.

It is simply not "clear that [Mr. Friday] would not have" received a permit if he had applied, and therefore it is not clear that he "would not have been accommodated by applying" for one. Gov't. App. 191. We therefore conclude that it was not futile for Mr. Friday to apply for a permit.

## B. Governmental Interest In Requiring Permits

Mr. Friday next argues that the permitting system is impermissible on its face because the government has not shown that the eagle population would suffer if takings for religious use were completely unregulated. This argument goes well beyond the order of the district court, which conceded that "some regulation of the taking of eagles is necessary to further [the government's] compelling

interests. . . . It is not the permitting process itself that the Court finds objectionable." Gov't App. 195. We agree with the district court that on its face the permitting system is permissible. *Accord*, *United States v. Hugs*, 109 F.3d 1375, 1378 (9th Cir. 1997) (per curiam) ("[T]he statute and permit system provide the least restrictive means of conserving eagles . . . ."); *United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001) (per curiam) (same).

The government points to three ways that the permit system advances its compelling interest. First, the system allows the government to keep track of which eagles have been legally taken and by whom. This allows it both to determine when a reported eagle taking should result in a criminal investigation and also to reassess its regulations in response to shifts in the eagle population. Without it, the government would be hard-pressed to distinguish between bona fide religious takings and other depredations on the eagle population, such as black marketeering. Second, the system gives the government some ability to influence "the number, species, and age of eagles taken, and the season or geographic area from which they are taken." Gov't Supp. Reply Br. 9. In some habitats, for example, the eagle population is likely to be better preserved if a floating eagle with no permanent mate is taken rather than one of a "nesting pair[]." Gov't App. 14–15. Third, the permit system allows it to allocate the right to take eagles among all Native American applicants in the event that there are more demands than the population can accommodate.

-32-

Mr. Friday responds that the government has not done sufficient empirical research to show that there would be too many religious takings if there were no permit requirement. *See* Aplee.'s Supp. Answer Br. 32–33 ("What is missing . . is any quantitative study establishing that the 'harvest' of religious takes occurring outside a permitted system would be too large to sustain the current population of adult bald eagles . . . .").

We do not think this is a valid objection. The government cannot be expected to quantify the precise impacts of uncertain future events, especially where the takings would be in secret and would not be reported to governmental authorities. Mr. Milsap testified that without a notification requirement, when Native Americans take an eagle the government "would have no way of assessing, in a predictive way, what the impacts of that harvest was on eagle populations[,] which would potentially increase . . . the possibility of reaching that point of catastrophic declines without us ever knowing we were getting close." Supp. App. 300.

Moreover, as the defendant concedes, the government has a compelling interest in protecting bald and golden eagles. That interest is compelling as regards small as well as large impacts on the eagle population. As we stated in *Hardman*, "[t]he bald eagle would remain our national symbol whether there were 100 eagles or 100,000 eagles." 297 F.3d at 1128. Even if unregulated religious takings would not be numerous enough to threaten the viability of eagle

-33-

populations, the government would still have a compelling interest in ensuring that no more eagles are taken than necessary, and that takings occur in places and ways that minimize the impact. Jody Millar, an FWS biologist, testified that the ability to regulate "geographic location, season, age of bird, et cetera" allows the government to "reduce the impact" on the eagle population from a given number of takes. Supp. App. 332. She declared in an affidavit that "[t]he loss of an adult breeding pair may be equivalent to the loss of 10–15 fledgling eagles," because the eagle's "main key to success is survivability of the adults (as opposed to the production of large numbers of young early and frequently)." Gov't App. 14. Thus, for example, under the permit system a person in Mr. Friday's position might be directed to take a fledgling eagle rather than an adult member of a nesting pair.

This is more than "'mere possibilit[y], based on limited evidence supplemented by speculation,'" as Mr. Friday asserts. Aplee.'s Supp. Answer Br. 32 (quoting *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1026 (10th Cir. 2004) (McConnell, J., concurring), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006)). The government supported these arguments with appropriate testimony about the way it manages the eagle population.[9] Mr. Friday presented no evidence contradicting

---

[9] This would be a closer case if the district court found any of the government's scientific witnesses to lack credibility. *See Bose*, 466 U.S. at

(continued...)

or discrediting these claims. On this record, we agree with the Eighth and Ninth Circuits that the permitting system survives a facial challenge.

We add that the Eagle Act and its attendant permitting process have the effect of protecting, as well as inconveniencing, the practices of the Northern Arapaho and other tribes that use eagles as a part of their religious ceremonies. If eagles were not protected or if there were no effective means of distinguishing between religious and nonreligious takings of eagles, it presumably would be more difficult for sponsors of ceremonials to obtain eagles for their sacred purposes.

## V. AS-APPLIED CHALLENGES

We turn now to Mr. Friday's as-applied challenges to aspects of the permitting process that affected him: the FWS's failure to publicize the permit system among the affected Native American population, and the FWS's decision to prosecute religious takings of eagles rather than deaths resulting from electrical transmission systems.

### A. Lack of Outreach

Mr. Friday contends that RFRA requires the FWS to engage in affirmative outreach to ensure that tribes are aware of the permitting process if they are

___

[9](...continued)
499–500. However, the court made no such finding, and indeed agreed with the government that some sort of permitting system was necessary (presumably on the basis of this evidence).

unsatisfied with the Repository. If it does not, Mr. Friday contends, the process is more restrictive than necessary. The district court appeared to lend some weight to this argument, listing the lack of "outreach programs advising Native Americans of the fatal take permitting process," as one of the factors in making its finding of futility. Gov't App. 190. We do not think such outreach is required to render the system the least restrictive means of preserving the eagle.

At the outset we wish to dispel the claim—made at times in Mr. Friday's briefs—that the permitting process is "*de facto* unavailable," and "conceal[ed]." Aplee.'s Br. 27–28. The process is not a secret. Unlike the laws Caligula put in small print "hung . . . up upon high pillars" so nobody could read or obey them, 1 William Blackstone, *Commentaries* *46, both the prohibition on taking eagles and the availability of permits for tribal religious purposes are published in the U.S. Code. 16 U.S.C. §§ 668, 668a. The regulations are published in the Code of Federal Regulations. 50 C.F.R. §§ 22.1, .22. Both the statutory and regulatory texts are available on the FWS website, which also contains a link to an online copy of the application for a permit to take an eagle. United States Fish and Wildlife Service, Migratory Bird and Eagle Permits (2005), http://www.fws.gov/permits/mbpermits/birdbasics.html; Supp. App. 263–64. That is at least as much notice as is given to the average criminal defendant subject to the legal fiction that "[e]very one is presumed to know the law." *United States v. Hodson*, 77 U.S. (10 Wall.) 395, 409 (1870).

-36-

Allegations of secrecy aside, Mr. Friday's claim is that the government must engage in outreach about the permitting process to parallel its outreach advertising the availability of the Repository. We do not agree. We are aware of no case under RFRA, or under the Free Exercise Clause prior to the enactment of RFRA, in which the government was held to have violated free exercise rights because the affected religious adherent was unaware of the availability of an accommodation and therefore did not take advantage of it. A demand for outreach is not a request that the government lift a "restricti[on]," 42 U.S.C. § 2000bb-1(b)(2), on the defendant's religious exercise. It is a demand that the government take affirmative steps to reach religious groups and advertise useful programs to them. Demands for affirmative governmental assistance are generally disfavored in free exercise cases. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) ("The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'") (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring)).

Mr. Friday argues that the government's trust obligation to Native American tribes requires it to do more—that "the Government should have bent over backwards to ensure Indians knew they were eligible for a permit." Aplee.'s Br. 32. Mr. Friday relies on the common-law duty of a trustee to tell the

beneficiary about the contents of a trust. *See, e.g.*, Restatement (Second) of Trusts §§ 172–73. However, the cases on which he relies discuss particularized fiduciary duties that arise when a statute creates a fiduciary relationship or when the government holds property in trust for the tribe. *See United States v. Mitchell*, 463 U.S. 206, 224–25 (1983); *see also Cobell v. Kempthorne*, 455 F.3d 317, 319 (D.C. Cir. 2006); *Cobell v. Norton*, 240 F.3d 1081, 1088–89 (D.C. Cir. 2001). The bald eagle is not a trust corpus held for Native Americans, and neither Mr. Friday nor the tribe has explained what evidence there is that Congress intended to create such a relationship here. Absent such evidence, there is no trust obligation in a legal sense. And in any event, the proper remedy for the government's breach of such a trust obligation is to sue for breach of trust, not to bar the government from enforcing otherwise legitimate criminal laws.

### B. Electrocution

Finally, Mr. Friday contends that the government could preserve the eagle in a less restrictive manner by criminally prosecuting electric companies whose power lines kill eagles. As he puts it, "had Mr. Friday been treated as deferentially as a power line company, the government would not have used criminal prosecution as its tool for protecting eagles." Aplee.'s Br. 31. Mr. Friday does not demand that the power companies be more heavily regulated than they are now; he demands that the government "mere[ly] enforce[] existing laws against utility companies." Aplee.'s Supp. Answer Br. 38. In essence, Mr. Friday

-38-

claims that the government fails to protect the eagle against a secular threat of equal seriousness.

Mr. Friday is correct that when strict scrutiny is applicable the government is generally not permitted to punish religious damage to its compelling interests while letting equally serious secular damage go unpunished. As the Supreme Court explained in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, "[i]t is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." 508 U.S. 520, 547 (1993) (internal quotation marks and ellipsis omitted); *accord O Centro*, 546 U.S. at 433; *FOP Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364–67 (3d Cir. 1999); Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1327 (2007). Underinclusive enforcement of a law suggests that the government's "supposedly vital interest" is not really compelling, and can also show that the law is not narrowly tailored. *Lukumi*, 508 U.S. at 546–47 (internal quotation marks omitted). Here, however, the government's treatment of the electric companies does not belie the importance of its interests but rather confirms it.

Electric lines do kill a number of eagles—"perhaps thousands . . . every year," according to Mr. Milsap. Supp. App. 301. An eagle's wingspan can close a circuit between two live wires, and eagles use power lines in treeless areas as a perching substitute. This prompted the district court to comment—although this

comment was not clearly related to a legal conclusion—"that a more significant cause of eagle mortality [than lethal take permits] is electrocution." Gov't App. 195.[10] The government has responded to this problem with an aggressive interpretation of the Eagle Act, treating the unintentional killing of eagles as a strict liability criminal offense. In the one recorded case on the subject, a Colorado district court agreed with the government, and refused to dismiss criminal charges under the Eagle Act and the Migratory Bird Treaty Act against a rural electric company whose wires had killed 38 eagles, without proof of intent or even of negligence. *United States v. Moon Lake Elec. Ass'n, Inc.*, 45 F. Supp. 2d 1070 (D. Colo. 1999); *see* Larry Martin Corcoran & Elinor Colbourn, *Shocked, Crushed and Poisoned: Criminal Enforcement in Non-Hunting Cases Under the Migratory Bird Treaties*, 77 Denv. U. L. Rev. 359, 391–92 (1999) (article by Justice Department lawyers discussing the *Moon Lake* prosecution).

Using the threat of prosecution under the *Moon Lake* theory as a stick, the government encourages companies to enter voluntary "avian protection plans" in exchange for the exercise of prosecutorial discretion. Supp. App. 302–03. These plans can require companies to install guards or reposition wires and also require reporting of eagles that are nonetheless electrocuted. *See generally* Avian Power

---

[10] After this case was briefed and argued, Mr. Friday submitted a motion asking us to take judicial notice of facts contained in a newspaper article—that a number of golden eagles had recently been killed by power lines in Wyoming. These facts do not satisfy Fed. R. Evid. 201(b), and we therefore deny the motion.

Line Interaction Committee, *Suggested Practices for Avian Protection on Power Lines: The State of the Art in 2006* at 183–200 (2006); U.S. Fish and Wildlife Service & Avian Power Line Interaction Committee, *Avian Protection Plan (APP) Guidelines* 16–83 (2005).  The government tells us that this approach is the most effective means of protecting the eagle population from electrocution: the threat of possible prosecution exacts voluntary efforts to preserve the eagle, but more criminal prosecutions for unintentional killings would both jeopardize the voluntary agreements and give companies an incentive to hide, rather than to report, eagle deaths.  We have no basis for doubting this assessment, and in light of the executive's vested and exclusive authority over criminal prosecution, *see Morrison v. Olson*, 487 U.S. 654, 692–96 (1988); *United States v. Cox*, 342 F.2d 167, 170–72 (5th Cir. 1965); *id.* at 190–96 (Wisdom, J., concurring specially), we must defer.

The government's response to the problem of electrocution thus confirms rather than refutes the strength of the government's interest in the eagle.  Indeed, with respect to both religious and secular threats to the eagle, the government appears to take a similar approach: it requires persons with legitimate interests in conflict with eagle protection to conduct their activities in such a way as to minimize the impact.  By using the threat of criminal prosecution it forces them to comply with limitations and subjects their compliance to scrutiny—whether

under the statutory permit process in the case of religious uses, or avian protection plans in the case of electric companies.

It is also plausible to think that the government is entitled to treat intentional takings as closer to the core of the Act than unintentional accidents that are a byproduct of providing essential services. As the *Moon Lake* court noted, there is a practical difference between accidental killings and those that could be prevented through reasonable measures. "Because the death of a protected bird is generally not a probable consequence of driving an automobile, piloting an airplane, maintaining an office building, or living in a residential dwelling with a picture window, such activities would not normally result in liability . . . even if such activities would cause the death of protected birds." *Moon Lake*, 45 F. Supp. at 1085. We need not decide the legitimacy of this distinction between intentional and unintentional acts, however, because the government has demonstrated that it does not in fact "leave[] appreciable damage" by power companies "unprohibited." *Lukumi*, 508 U.S. at 547 (internal quotation marks omitted).

## VI. CONCLUSION

By enacting a law banning the taking of eagles and then permitting religious exceptions, the government has tried to accommodate Native American religions while still achieving its compelling interests. That accommodation may be more burdensome than the Northern Arapaho would prefer, and may

sometimes subordinate their interests to other policies not of their choosing. Law accommodates religion; it cannot wholly exempt religion from the reach of the law. George Washington wrote that it was his "wish and desire that the Laws may always be as extensively accommodated to [freedom of conscience], as a due regard for the Protection and essential Interests of the Nation may Justify, and permit." Letter from George Washington to the Society of Quakers (Oct. 1789), *reprinted in* Tara Ross & Joseph C. Smith, Jr., *Under God: George Washington and the Question of Church and State* 220, 221 (2008). The First Congress rejected a draft of the First Amendment that would have barred all laws "touching religion," in favor of the more specific strictures on laws prohibiting its free exercise or respecting its establishment. *See* 1 Annals of Congress 759, 796 (Joseph Gales ed. 1834) (1789).

We are not oblivious to the possibility that the government's permit process for the religious taking of eagles may be more accommodating on paper than it is in practice. If so—if the process is improperly restrictive, burdensome, unresponsive or slow—we trust that members of the tribe will not hesitate to vindicate their rights either through petition or in a proper suit. This, however, is not the occasion to consider those issues, because the defendant made no attempt to use the system. Federal courts are limited to reviewing the problems that arise in a particular case.

Both parties' motions to take judicial notice are **DENIED**.  The judgment of the district court is **REVERSED** and this case is **REMANDED** for further proceedings in accordance with this opinion.