Tuan THAI, also known as Anh Tuan Thai, also known as Anh Thai Tuan, Petitioner–Appellee,

v.

John ASHCROFT, Attorney General, Respondent–Appellant.

No. 03–35626.

United States Court of Appeals, Ninth Circuit.

Filed Nov. 24, 2004.

Jay Warren Stansell, Federal Public Defender's Office Western District of Washington, Seattle, WA, for Petitioner–Appellee.

Jacqueline Dryden, Washington, DC, for Respondent–Appellant.

Before HUG, GRABER, and CLIFTON, Circuit Judges.

Order; Dissent by Judge KOZINSKI.

### ORDER

The panel has voted to deny the petition for rehearing. Judges Graber and Clifton have voted to deny the petition for rehearing en banc; and Judge Hug so recommends.

A judge of the court called for a vote on the petition for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R.App. P. 35(f).

The petition for rehearing and the petition for rehearing en banc, filed on July 1, 2004, are DENIED.

KOZINSKI, Circuit Judge, with whom Judges TALLMAN, BYBEE, CALLAHAN and BEA join, dissenting from denial of rehearing en banc:

This is a case of exceptional importance. In rejecting the Attorney General's sincere effort to bring 8 U.S.C. § 1231(a)(6) into compliance with *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the panel seriously undermines the power of the executive branch as to immigration, an area within its peculiar authority. In so doing, the panel releases into the population of our circuit an individual who has been found, by clear and convincing evidence, to be mentally disturbed and dangerous. We should not let this happen.

1. A few years ago, we considered whether an alien who had been given permanent resident status, but had lost that status as a result of criminal misconduct, could be held in custody indefinitely because our government could not find a country to deport him to. *See Ma v. Reno*, 208 F.3d 815 (9th Cir.2000). The government claimed this authority based on 8 U.S.C. § 1231(a)(6), which seems to give the AG such power. The statute provides:

> An alien ordered removed [1] who is inadmissible ... [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision....

8 U.S.C. § 1231(a)(6) (as quoted with alterations in *Zadvydas*, 533 U.S. at 682, 121 S.Ct. 2491). The government also relied on *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), which had held that an alien who was denied re-admission into the United States could be held indefinitely on Ellis Island if the government could find no country to which he could be deported.

The district court had granted a writ of habeas corpus ordering Ma's release, and we affirmed, holding that the statute did not authorize Ma's indefinite detention.

Because the Fifth Circuit had reached the opposite conclusion in the case of an alien named Zadvydas, the Supreme Court granted cert, consolidated the cases and eventually ruled against the government. The Court recognized that the statute, literally read, seemed to allow the government to detain indefinitely any alien who could not be deported because no country would have him. However, such a reading, the Court held, would raise grave doubts about the statute's constitutionality because it would allow the potentially indefinite detention of an individual entitled to due process protection. *Zadvydas,* 533 U.S. at 690–96, 121 S.Ct. 2491. The Court distinguished *Mezei* on the ground that the alien there had not been admitted to the United States and thus was entitled to lesser constitutional protection than those who had been lawfully admitted. *Id.* at 693–95, 121 S.Ct. 2491.

The Court also recognized—and distinguished—earlier cases that permitted indefinite detention of especially dangerous individuals. *Id.* at 690–92, 121 S.Ct. 2491. Those cases, the Court noted, authorized indefinite detention only "when limited to specially dangerous individuals and subject to strong procedural protections." *Id.* at 691, 121 S.Ct. 2491 (citing *Kansas v. Hendricks,* 521 U.S. 346, 368, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding scheme that imposed detention upon "a small segment of particularly dangerous individuals" and provided "strict procedural safeguards"); *United States v. Salerno,* 481 U.S. 739, 747, 750–52, 107 S.Ct. 2095, 95

L.Ed.2d 697 (1987) (in upholding pre-trial detention, stressing "stringent time limitations," the fact that detention is reserved for the "most serious of crimes," the requirement of proof of dangerousness by clear and convincing evidence, and the presence of judicial safeguards); and *Foucha v. Louisiana,* 504 U.S. 71, 81–83, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (striking down insanity-related detention system that placed burden on detainee to prove non-dangerousness)).

In light of these constitutional doubts, the Court construed section 1231(a)(6) as authorizing the AG to hold an alien for no more than six months, unless the government can show a reasonable probability that it can remove him. If there is no such probability, the alien may bring a habeas petition after the six-month period, and the court must order him released, subject to conditions to be set by the AG.

2. Following *Zadvydas,* the AG promulgated a comprehensive set of regulations intended to narrow the broad scope of his authority and bring it into conformity with the Supreme Court's ruling. *See* 8 C.F.R. §§ 241.13–.14. As to most aliens, the regulations provide for release if there is no significant likelihood of removal. *Id.* § 241.13(g)(1). However, as to certain narrow classes of aliens—those who pose peculiar risks to the public or the security of the United States—the regulations set up a procedure for longer detention. One such class is that of aliens who have committed crimes of violence, are likely to do so again because of a mental condition or personality disorder and cannot be rendered harmless through any conditions of release. *Id.* § 241.14(f)(1). If the Commissioner[1] determines in writing—after ar-

---

1. "Commissioner" is defined to mean "the Director of the Bureau of Citizenship and Immigration Services, the Commissioner of the Bureau of Customs and Border Protec-

tion, and the Assistant Secretary for the Bureau of Immigration and Customs Enforcement." 8 C.F.R. § 1.1(d).

ranging for a report by a Public Health Service (PHS) physician based on a full medical and psychiatric exam, *id.* § 241.14(f)(3)—that these conditions apply, the regulations authorize a preliminary hearing (termed a "reasonable cause hearing") before an immigration judge who must decide whether there are grounds for further proceedings. *Id.* § 241.14(f)(2), (h). The alien is given a list of free legal service providers and an interpreter, he has the right to examine evidence, and he may cross-examine government witnesses and the author of any medical or mental health report used in the dangerousness determination. *Id.* § 241.14(g). If the government persuades the IJ that such grounds exist, the immigrant is bound over for a merits hearing where the government must prove by clear and convincing evidence that the alien "should remain in custody because [his] release would pose a special danger to the public" under the standards of section 241.14(f)(1). *Id.* § 241.14(i)(1). In other words, indefinite detention for being "specially dangerous" under section 241.14(f) requires the participation of three executive departments— the Department of Homeland Security, which runs the bureaus listed in note 1 *supra;* the Department of Health and Human Services, which runs the PHS; and the Department of Justice, which employs the IJs in the Executive Office for Immigration Review.

This is the process in which our petitioner finds himself. Though his name is Thai, he is a Vietnamese citizen who entered the United States in 1996. Since coming to this country, he has been convicted of third-degree assault for a domestic violence incident, felony harassment and third-degree rape, as well as "merely" taking a motor vehicle without permission. When he finished serving his state sentences, the federal government took him into custody and tried to remove him as an alien convicted of aggravated felonies. But Vietnam doesn't have a repatriation agreement with the United States and so wouldn't take Thai back. Thus, there was no reasonable probability that Thai could be deported, and the government started its dangerousness proceedings under section 241.14(f). The IJ found reasonable cause to hold Thai as dangerous, and ultimately found that the government had shown by clear and convincing evidence that "Thai's release would pose a special danger to the public, and that Thai's continued and potentially indefinite detention was therefore justified." *Thai v. Ashcroft,* 366 F.3d 790, 793 (9th Cir.2004). Thai appealed to the BIA.

3. The panel's opinion came down before the BIA could rule on Thai's appeal. The panel held that the AG's post-*Zadvydas* regulations are invalid and, because everyone agrees that Thai could not be deported, ordered him released. The panel's rationale is straightforward: The Supreme Court in *Zadvydas* construed section 1231(a)(6) as containing a categorical six-month limit on how long the government may hold an alien subject to removal. After that period, he may be held only if his removal is reasonably foreseeable, and must be released if it is not. This six-month limit applies to all aliens; there is no exception in the statute for aliens who are mentally disturbed and dangerous. In drafting the regulations, the AG is limited to the authority granted to him by the statute, as construed by the Supreme Court; thus, he has no authority to adopt a regulation that authorizes the detention of any alien who cannot be removed—even a mentally deranged, dangerous one like Thai—for longer than six months.

4. The panel's reasoning, though superficially plausible, is wrong. Contrary to the panel's premise, the Supreme Court in *Zadvydas* did not interpret section

1231(a)(6) for all time and all purposes. Rather, the Supreme Court's opinion is limited to the case presented to it, that of two aliens who had not been proven dangerous to the community. *See also* note 4 *infra.* This is the only question the Supreme Court *could* have answered, because the statute itself has no mechanism for narrowing the class of aliens who may be held or for putting the burden on the government to prove dangerousness. In such circumstances, the Court said, an alien can be held for no more than six months, if his removal is no longer foreseeable.

The Court had no occasion to consider the analytically separate question whether the AG has authority to narrow the class of aliens who may be detained—as he clearly did, *see* 8 U.S.C. § 1103(a)(3) (2000)[2]—and whether, once that class of aliens is narrowed, and the government has met its burden of showing dangerousness, the aliens so identified may be detained more than six months. But the Court made it abundantly clear that it was the broad sweep of the statute and the absence of procedural protections that gave it pause about the statute's constitutionality: "The provision authorizing detention does not apply narrowly to 'a small segment of particularly dangerous individuals,' say, suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations.... Moreover, the sole procedural protections available to the alien are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (in the Government's view) significant later judicial review." *Id.* at 691–92, 121 S.Ct. 2491 (quoting *Hendricks,* 521 U.S. at 368, 117 S.Ct. 2072).

The possibility that mere visa violators could be detained indefinitely so concerned the Court that it mentioned it twice. *Id.* at 691, 697, 121 S.Ct. 2491.

The AG's regulations are tailored to allay the Supreme Court's constitutional doubts. No longer may all aliens subject to deportation be held indefinitely if the government is unable to deport them; only those in narrowly defined categories may be so held. No longer does the burden fall on the alien to prove that he is not dangerous; the government must prove, by clear and convincing evidence, that the alien falls in one of the narrow categories. The IJ's decision is reviewable by the BIA and then the courts by way of habeas corpus.

There can be no doubt that, had the regulations been promulgated *before Zadvydas,* they would have been upheld. In adopting the regulations, the AG drew upon a broad grant of regulatory authority, and the statute itself—as written by Congress—clearly authorizes detention of aliens beyond six months. Because the regulations obviate the constitutional doubts expressed in *Zadvydas,* the reasons given by the Court in that opinion would not have provided a basis for striking down the regulations. There is no legitimate reason the result should be different just because the AG promulgated the regulations after *Zadvydas.* The opinion in that case construed the statute and found that it imposed a six-month limit if applied to aliens who were given no procedural protections or judicial review. The Court said nothing about how the statute is to be construed in situations where the alien is given the procedural protections it found missing in *Zadvydas.*

---

**2.** This authority now belongs to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103(a)(3).

Nor are the regulations an end-run around *Zadvydas*. In promulgating the regulations, the AG scrupulously followed the Supreme Court's teachings. Ordinary aliens who merely overstay their visas or otherwise pose no special danger to the community are to be released within the time specified by the Supreme Court. Only those few aliens who are found, after a series of rigorous procedures, to pose a serious danger may be held longer.

This is not an ordinary question of statutory construction or administrative law; it implicates important separation of powers principles. The judiciary certainly has the power to construe statutes and ensure they meet constitutional standards. But the other branches of government also have the power, indeed the obligation, to ensure compliance with the Constitution. The Supreme Court, confronted with a very broad statute, narrowed its scope to avoid unconstitutionality, but the Court's method of narrowing is not the only permissible one. The AG, pursuant to his statutory delegation of regulatory authority, has selected a different method of conforming the statute to the requirements of the Constitution: He has accepted the six-month limitation as to most aliens and has provided stringent procedural protections for narrow classes of aliens who are believed to be a danger to the community. Given the plenary authority of the political branches in the field of immigration, *see Boutilier v. INS*, 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967), the judiciary must be particularly careful not to cut off the AG's earnest effort to fulfill the function entrusted to him by Congress within constitutional limits. The panel's opinion takes the opposite approach, perversely leaving the AG, when acting pursuant to authority expressly granted to him by Congress, with fewer powers to detain undocumented aliens who are mentally disturbed and dangerous than the states have

in detaining dangerous U.S. citizens. *See* cases cited *supra* p. 968.

5. Nor is this just an abstract legal issue. The panel's decision has immediate, real-life consequences: It requires the government to release from federal custody an individual who, a PHS psychiatrist predicted, will repeat his actions if released. R.E. 129.

What exactly are those actions? I have already noted that Thai was convicted of third-degree assault. The domestic violence incident behind that conviction began when he became angry at his girlfriend because she was singing about their relationship. He threatened to hit her, then lunged at her and threatened to kill her. He knocked her down and punched her 10 to 20 times. He pushed a chair down on her and choked her with both hands, then bound her up with a cable around her wrists and ankles. R.E. 21. He also stuffed a microphone into her mouth and turned up the radio. Appellants' Br. at 4.

Thai was also convicted of third-degree rape. While his friend was out fishing in Alaska, he raped his friend's girlfriend repeatedly over the course of several months, beginning while she was six months pregnant. He monitored her phone calls with her boyfriend, threatened to put cocaine in her vagina and harm her other children if she tried to kick him out, and threatened to kill her more times than she could remember. R.E. 32–33.

Nor did Thai temper his behavior in custody. He called his rape victim from jail and threatened to find her and burn her house down when he got out. R.E. 33. At a hearing where the rape victim was trying to get a protective order against him, he threatened her with "payback," told the commissioner to "fuck off," and became physically aggressive to jail security. *See* R.E. 34, 51. A cellmate of his at a

federal psychiatric facility reported that he had threatened to kill his INS judge and prosecutor after he was released. Resp't's Pet. for Reh'g & Reh'g En Banc at 7 n. 3. His reasonable cause hearing was continued to the next day after he became abusive to his interpreter, whom he almost hit, as well as to an officer and the immigration judge. His comments included "Fuck this shit," "Fuck (inaudible)," "Fucking Court," "Fucking (inaudible)," "Shit," "Court mother fucking (speaking Vietnamese)" and "Mother fucker—", as well as some untranslated comments in Vietnamese. See R.E. 160–80.

He is not in the least remorseful and is in denial regarding his past behavior. He has participated in no sex offender programs. He has said his life consists of "beating people up and having sex with women," and that once he is released "even the judge could not do anything" to him. He believes his victims and witnesses "conspire" against him to "rob him of his worldly goods," and that his victims' injuries are the result of their own actions. See 1 S.E.R. 47–49.

The panel cites, apparently to assuage concerns about the effects of its ruling, state statutes designed to "involuntarily commit violent sexual predators," 366 F.3d at 799 (citing Wash. Rev.Code §§ 71.05.150, 71.09.060), but these stat-utes do not apply to Thai. The first provision authorizes a limited detention of mentally ill and dangerous people for "not more than a seventy-two hour evaluation and treatment period." See id. § 71.05.150(1)(b). The Washington Code states that the "short-term civil commitment system" of chapter 71.05 is inappropriate for the "small but extremely dangerous group of sexually violent predators," id. § 71.09.010, which is why sexually violent predators, as defined in section 71.09.020(16), are subject to more serious, long-term detention under chapter 71.09. But Thai doesn't fall within this chapter either, because his offenses—including third-degree rape and third-degree assault—are not included in the list of sexually violent offenses in section 71.09.020(15). State officials thus have no authority even to initiate proceedings against him under section 71.09.030.[3]

Nothing in Zadvydas requires releasing this man, or the four others in our circuit who the government says are similarly situated.[4] The Court in Zadvydas focused on the question presented to it—whether the statute could be construed as authorizing the indefinite detention of aliens who have not been proven to be a danger to the community—and answered that question in the negative. Because the current regulations were not in place, the Court had

---

3. I have not conducted an independent investigation of Washington law to determine whether other provisions might authorize the state to detain Thai indefinitely, but I do note that Thai himself—who is ably represented—cites nothing else.

4. According to the government, these "include a pedophile who was sentenced to over 13 years in prison for continuous sexual abuse of a minor under age 14 and for a lewd act on a child under age 15; a pedophile convicted of sexual abuse of a 12-year old girl and sexual contact with an 8-year old girl; a schizoaffective/bi-polar arsonist who set a fire in an occupied building, and who has convictions for simple assault, aggravated assault, and criminal possession of a weapon; and a murderer who was diagnosed as a malingerer (faking mental illness) and with antisocial personality disorder." Resp't's Pet. for Reh'g & Reh'g En Banc at 12–13 (footnote omitted). The government also notes that the pedophile "was paroled by the DHS on June 15, 2004, pursuant to the district court's release order. Within two weeks, on June 29, 2004, the alien had violated the conditions of his parole and was taken back into DHS custody." Id. at 13 n. 6.

no occasion to discuss—or even contemplate the possibility of—holding certain aliens for a longer time if the government establishes their dangerousness by clear and convincing evidence.[5] I can see no reason for reading the Court's opinion more broadly than it was written, thereby cutting off the AG's authority to carry out the will of Congress—keeping our community safe from highly dangerous aliens, consistent with the Constitution. We should not permit this to happen without a closer examination by an en banc panel.

---

**5.** Nor, of course, could the Court have narrowed the statute to those aliens who are especially dangerous to the community. To do so, the Court would have had to adopt the kind of highly complex regulatory scheme that is well beyond the competence of the judiciary to promulgate. Fortunately, the AG was not so constrained, having been given broad authority to implement the statute through regulations. 8 U.S.C. § 1103(a)(3) (2000).