**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 12, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SANTOS HERNANDEZ-CARRERA;
PABLO SANTIAGO HERNANDEZ-
ARENADO,

        Petitioners-Appellees,

v.

KEN CARLSON, Field Office
Director, Immigration and Customs
Enforcement, Department of
Homeland Security; E.J. GALLEGOS,
Warden, USP-Leavenworth,

        Respondents-Appellants.

No. 08-3097

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 05-CV-3051-RDR)**

---

Thomas H. Dupree, Jr., Deputy Assistant Attorney General (Gregory G. Katsas,
Acting Assistant Attorney General; David J. Kline, Director, District Court
Section; Christopher J. Walker, Attorney, Appellate Staff; Samuel P. Go, Trial
Attorney, with him on the briefs), United States Department of Justice, Office of
Immigration Litigation, Washington, D.C., for Respondents-Appellants.

Melissa Harrison, Assistant Public Defender for the District of Kansas (David J.
Phillips, Federal Public Defender, with her on the brief), Kansas City, Kansas, for
Petitioners-Appellees.

---

Before **KELLY**, **McCONNELL** and **TYMKOVICH**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

This case requires us to determine whether an agency interpretation ordinarily owed deference under the framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), is foreclosed by a prior Supreme Court construction of the statute applying the canon of constitutional avoidance. We conclude that under the principles outlined in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982–83 (2005), a subsequent, reasonable agency interpretation of an ambiguous statute, which avoids raising serious constitutional doubts, is due deference notwithstanding the Supreme Court's earlier contrary interpretation of the statute.

## I. BACKGROUND

Santos Hernandez-Carrera and Pablo Santiago Hernandez-Arenado are natives and citizens of Cuba. They entered the United States illegally in 1980, during the Mariel boatlift. Although both were classified as "inadmissible aliens," they were granted immigration parole in the United States. The government revoked both aliens' parole, however, in part because of their criminal convictions while on parole. Mr. Hernandez-Carrera and Mr. Hernandez-Arenado were both issued exclusion and deportation orders, based on their lack of entry documents and their convictions for crimes of moral turpitude.

Under the Immigration and Nationality Act, once a final order of removal has been entered against an alien, the government typically must remove the alien from the United States within ninety days. 8 U.S.C. § 1231(a)(1)(A). However, 8 U.S.C. § 1231(a)(6) authorizes the Attorney General to detain certain classes of aliens beyond the ninety day removal period. It provides, in relevant part, that:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period . . . .

In February 2006, immigration judges separately ordered the continued detention of Mr. Hernandez-Carrera and Mr. Hernandez-Arenado, pursuant to 8 C.F.R. § 241.14, a regulation promulgated by the Attorney General under 8 U.S.C. § 1231(a)(6). This regulation allows United States Immigration and Customs Enforcement ("ICE") to "continue detention of particular removable aliens on account of special circumstances even though there is no significant likelihood that the alien will be removed in the reasonably foreseeable future." 8 C.F.R. § 241.14(a). The regulation recognizes four categories of aliens whose special circumstances warrant continued detention: (1) aliens with a highly contagious disease that is a threat to public safety; (2) aliens detained on account of serious adverse foreign policy consequences of release; (3) aliens detained on account of security or terrorism concerns; and (4) aliens determined to pose a special danger to the public. 8 C.F.R. § 241.14(b–d), (f).

Both Mr. Hernandez-Carrera and Mr. Hernandez-Arenado were found to "pose a special danger to the public" under 8 C.F.R. § 241.14(f). Under § 241.14(f), in order to justify an alien's continued detention, the government must prove by clear and convincing evidence that the alien has: (1) previously committed one or more crimes of violence as defined in 18 U.S.C. § 16; that (2) due to a mental condition or personality disorder and behavior associated with that condition or disorder, the alien is likely to engage in acts of violence in the future; and (3) no conditions of release can reasonably be expected to ensure the safety of the public. On the basis of Mr. Hernandez-Carrera's and Mr. Hernandez-Arenado's criminal records and mental health evaluations, immigration judges found these elements to be satisfied in both cases.

Mr. Hernandez-Carrera was convicted of rape with force and bodily injury in 1988. He was again convicted of battery and indecent exposure in 1990 and sentenced to additional jail time. Upon his release from prison in 1993, Mr. Hernandez-Carrera was detained by the Immigration and Naturalization Service ("INS"). While in INS custody, Mr. Hernandez-Carrera was diagnosed with schizophrenia and examined several times by Bureau of Prisons personnel. A mental health evaluation concluded that, if released, Mr. Hernandez-Carrera "would need a high level of structure and security and continued 24-hour supervision for the rest of his life." Even then, the report concluded that "it is most probabl[e] that Mr. Hernandez-Carrera would be a direct danger to the

-4-

public;" another report determined that it was "quite likely" that he would engage in future violence if released. The immigration judge ("IJ") concluded that the evidence "establishes that [Mr. Hernandez-Carrera's] refusal to take medication, along with [his] mental condition, makes relapse, escape, and decomposition, highly likely if [he] is released from prison." The IJ therefore determined that "no reasonable conditions of release would ensure public safety" and ordered Mr. Hernandez-Carrera's continued detention.

Mr. Hernandez-Arenado was convicted of sexually assaulting a seven year-old boy in 1984. He has admitted to involvement in "several hundred" pedophilic contacts with children in Cuba and in the United States. App. 98. Upon completing his sentence in 1987, he was released into INS custody. While in custody, he was diagnosed with pedophilia. Several mental health evaluations concluded that Mr. Hernandez-Arenado could not be released without exposing the public to danger, noting that he was unlikely to change his behavior or to "accept constraints upon his acting on his impulses and feelings." Indeed, Mr. Hernandez-Arenado has stated on several occasions that he does not believe sex with children is wrong. The IJ agreed with the government's mental health expert that if he was released, "nothing [would] stop [Mr. Hernandez-Arenado] from grabbing a child off the street and molesting the child just as he has done in the past." He therefore concluded that "there are no reasonable conditions of release

that can reasonably be expected to ensure the safety of the public" and ordered Mr. Hernandez-Arenado's continued detention.

Both aliens filed petitions for a writ of habeas corpus under 28 U.S.C. § 2241, challenging the constitutionality of their continued detention under 8 U.S.C. § 1231(a)(6) and 8 C.F.R. § 241.14. The district court believed itself to be governed by the Supreme Court's interpretation of 8 U.S.C. § 1231(a)(6) in *Zadvydas v. Davis*, 533 U.S. 678 (2001), and *Clark v. Martinez*, 543 U.S. 371 (2005), rather than the agency's construction of the statute pursuant to notice-and-comment rulemaking. *See Hernandez-Carrera v. Carlson*, 546 F. Supp.2d 1185, 1186–89 (D. Kan. 2008). It concluded that the Supreme Court had definitively interpreted 8 U.S.C. § 1231(a)(6) to permit detention only for a period "reasonably necessary to remove an alien from the United States," presumptively six months. *Id.* at 1187. Finding that 8 C.F.R. § 241.14 permitted continued detention for a period longer than six months, the district court reasoned that the regulation was not authorized by 8 U.S.C. § 1231(a)(6) and instead was "manifestly contrary to its authorizing statute as interpreted by the Supreme Court." *Id.* at 1189. Therefore, it determined that Mr. Hernandez-Carrera's and Mr. Hernandez-Arenado's continued detention under 8 C.F.R. § 241.14 was impermissible, and granted their writs of habeas corpus.

Mr. Hernandez-Carrera has been released pending this appeal. Mr. Hernandez-Arenado was ordered released, but the government has separately

sought to detain him under the Adam Walsh Act, 18 U.S.C. § 4248. On June 9, 2008, the United States District Court for the Southern District of Illinois dismissed the government's attempt to civilly commit Mr. Hernandez-Arenado. *United States v. Hernandez-Arenado*, 2008 WL 2373747 (S.D. Ill. June 9, 2008). It concluded that the government had no authority to detain Mr. Hernandez-Arenado, because he was not legally "in custody" within the meaning of the Adam Walsh Act. *Id.* at *5. The district court in that case has stayed its decision pending review by the Seventh Circuit. *United States v. Hernandez-Arenado*, 2008 WL 2568146 (S.D. Ill. June 23, 2008).

## II. ANALYSIS

It is well established that an agency's construction of a statute that it administers may be owed deference by courts when "the statute is silent or ambiguous" on the issue in question and the agency's reading represents a "permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Recently, the Supreme Court has also made clear that a "prior judicial construction of a statute trumps [a subsequent] agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982 (2005).

Therefore, in order to determine whether the Attorney General's construction of 8 U.S.C. § 1231(a)(6) warrants deference, notwithstanding the Supreme Court's contrary construction of the statute in *Zadvydas* and *Martinez*, we must ask: 1) whether "the statute is silent or ambiguous" as to the Attorney General's authority to detain certain categories of aliens beyond the ninety day removal period; and 2) whether the agency's construction of the statute represents a "permissible reading of the statute." It is to these questions we now turn.

**A. Whether 8 U.S.C. § 1231(a)(6) is "Silent or Ambiguous"**

We need not wrestle long with whether 8 U.S.C. § 1231(a)(6) is ambiguous. The Supreme Court has twice explicitly found the statute to be ambiguous as to whether and under what circumstances Congress authorized the Attorney General to detain aliens indefinitely. In *Zadvydas*, the government argued that the statute, by its clear terms, did not place a "limit on the length of time beyond the removal period that an alien who falls within one of the § 1231(a)(6) categories may be detained." *Zadvydas*, 533 U.S. at 689. The Court explained, however, that it could not find "any *clear* indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed." *Id.* at 697 (emphasis added). Therefore, it concluded that the scope of authority granted to the Attorney General by Congress to detain aliens beyond the ordinary ninety day removal period was "ambiguous." *Id. See also Martinez*, 543 U.S. at

378 (finding that the *Zadvydas* Court "rel[ied] on ambiguities in the statutory text" of § 1231(a)(6) when construing the statute).

That § 1231(a)(6) is ambiguous is further shown by the Court's invocation of the canon of constitutional avoidance in both *Zadvydas* and *Martinez*. "The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction . . . ." *Martinez*, 543 U.S. at 385. Where, however, Congress' intent is clear, the canon is inapplicable. *See Zadvydas*, 533 U.S. at 696. Thus, the Supreme Court's use of the canon demonstrates that it regarded the statute as genuinely susceptible of more than one reasonable interpretation.

## B. Whether the Agency's Construction is "Permissible"

A more serious question is presented as to whether the agency's construction of § 1231(a)(6), as implemented in 8 C.F.R. § 241.14, is a "permissible" one. The Attorney General promulgated 8 C.F.R. § 241.14 in response to the Supreme Court's holding in *Zadvydas*, in order to provide for the continued detention of limited classes of aliens in a manner comporting with constitutional requirements. *See* Continued Detention of Aliens Subject to Final Orders of Removal, 66 Fed. Reg. 56,968–69 (Nov. 14, 2001). The regulation interpreted § 1231(a)(6) to authorize an alien's long-term non-punitive detention only where limited special circumstances are present and particular procedural requirements are satisfied.

Mr. Hernandez-Carrera and Mr. Hernandez-Arenado, however, argue that 8 C.F.R. § 241.14 is an unreasonable construction of § 1231(a)(6) for three reasons. First, they argue that the Attorney General is no longer free to construe § 1231(a)(6), on the theory that the Supreme Court's holdings in *Zadvydas* and *Martinez* conclusively established the meaning of the statute. Second, they argue that "the canon of constitutional avoidance used in *Zadvydas* and [*Martinez*] to interpret the statute trumps *Chevron* deference." Aple. Br. 21, and that this precludes us from deferring to the agency in this case. Finally, they argue that even if deference is permissible as a general matter, the agency's construction of § 1231(a)(6) is unreasonable, because it raises serious questions as to the statute's constitutionality under the Due Process Clause. We consider each argument in turn.

## 1. Does the Principle of *Brand X* Apply When the Prior Judicial Interpretation Was By the Supreme Court?

Mr. Hernandez-Carrera and Mr. Hernandez-Arenado first contend that the Supreme Court's construction of § 1231(a)(6) in *Zadvydas* and *Martinez* forecloses any subsequent, contrary interpretation by the Attorney General. Similarly, the district court concluded that "*Zadvydas* and *Martinez* decide the constitutional extent of the Attorney General's authority under 8 U.S.C. § 1231(a)(6)." *Hernandez-Carrera*, 546 F. Supp.2d at 1190. This misapprehends,

however, the relative roles of courts and agencies when interpreting ambiguities in statutory delegations of power to agencies.

The Supreme Court held in *Chevron* that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." *Brand X*, 545 U.S. at 980 (describing *Chevron*'s holding). Judicial deference to administrative interpretations in these cases is not a policy choice, but rather a means of giving effect to congressional intent. When Congress leaves a gap within a statute administered by an agency, Congress impliedly entrusts the agency with authority to explain and fill in the interstices. Where, as here, Congress has expressly authorized an agency to engage in rulemaking, we will infer that Congress has delegated authority to the agency to address statutory ambiguities. *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). In such cases, we recognize that "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which Congress did not actually have an intent as to a particular result." *Id.*

In *Chevron*, the Supreme Court deferred to an agency's resolution of a statutory ambiguity, finalized through notice-and-comment rulemaking, *before* the Court had an opportunity to construe the statute. Here, the aliens urge us not to defer to an agency construction because it was developed only *after* the Supreme

Court had construed the statute in a contrary manner.  As the Supreme Court noted in *Brand X*, however, "whether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur."  *Brand X*, 545 U.S. at 983.  Were we to favor a judicial construction over a reasonable administrative agency construction in this case, we would be ignoring Congress' choice to empower an agency, rather than the courts, to resolve this kind of statutory ambiguity.

When a court tentatively resolves an ambiguity in a statute that an agency is empowered to administer, such a resolution carries the force of law until an agency issues a definitive interpretation of the kind that would ordinarily warrant *Chevron* deference.  This does not make judicial decisions subject to reversal by executive officers.  *Brand X*, 545 U.S. at 982.  The court's "precedent has not been 'reversed' by the agency, any more than a federal court's interpretation of a State's law can be said to have been 'reversed' by a state court that adopts a conflicting (yet authoritative) interpretation of state law."  *Id.* at 983–84.

Mr. Hernandez-Carrera and Mr. Hernandez-Arenado argue that *Brand X* "only applies to lower court decisions."  Aple Br. 22.  We disagree.  It is true, of course, that *Brand X* itself involved the question of whether the Ninth Circuit's—rather than the Supreme Court's—prior judicial construction of the Communications Act foreclosed a subsequent agency interpretation.  *See Brand X*, 545 U.S. 967, 982 (2005).  But we see no reason why the holding in *Brand X*

would not be equally applicable to agency constructions that displace tentative Supreme Court interpretations. In both cases, a court is merely giving due weight to Congress' intent to vest an agency with the power to fill in the gaps within its own statute. The aliens contend that "[a] different rule for Supreme Court precedents can be justified on the grounds that these opinion[s] have uniformity, publicity, and finality that are lacking in the lower courts." Aple Br. 22. But even if we assumed that there existed policy reasons to treat Supreme Court and lower court precedents differently in the face of contrary agency interpretations, we would not be free to do so. *Chevron* deference is not a policy choice subject to balancing against other policy considerations; it is a means of giving effect to congressional intent.

The aliens also rely on Justice Stevens' concurrence in *Brand X*. While agreeing that an agency's interpretation is not foreclosed by a *lower* court's prior construction, Justice Stevens suggested that the majority's reasoning "would not necessarily be applicable to a decision by [the Supreme Court] that would presumably remove any pre-existing ambiguity." *Brand X*, 545 U.S. at 1003 (Stevens, J., concurring). The government suggests that Justice Stevens' concurrence should be understood only to affirm the basic point that "a Supreme Court determination that a statute is unambiguous binds the lower courts." Aplt. Reply Br. 7 n.1. That said, some commentators have understood Justice Stevens to have reserved judgment on the question of whether *Brand X*'s core holding

-13-

would apply to an agency interpretation that conflicted with an existing Supreme Court construction of a statutory ambiguity. *See, e.g.*, Kathryn A. Watts, *Adapting to Administrative Law's Erie Doctrine*, 101 Nw. U. L. REV. 997, 1000 n.19 (2007).

Even if we understood Justice Stevens' concurrence to suggest that this question remains open, we would find unpersuasive the argument that *Brand X* applies to lower courts, but not to the Supreme Court. All of the "anomalous results" that would have followed from a contrary holding in *Brand X* would follow equally from a contrary holding in this case. *See Brand X*, 545 U.S. at 983–84. For instance, whether an agency's construction would be entitled to *Chevron* deference could turn on the happenstance of whether the Supreme Court construed the statute before the agency completed notice-and-comment rulemaking proceedings. This would produce a detrimental race between agency and courthouse. Entities that stood to lose from an agency's resolution of statutory ambiguities might pursue a definitive, favorable construction in the Supreme Court, while working to delay the agency from issuing a contrary, unfavorable interpretation entitled to *Chevron* deference. In addition, the rule advanced by Mr. Hernandez-Carrera and Mr. Hernandez-Arenado would "lead to the ossification of large portions of our statutory law," by precluding agencies from revising unwise judicial constructions of ambiguous statutes. *See id.* at 983 (quoting *Mead*, 533 U.S. at 247 (Scalia, J., dissenting)). Finally, the aliens' rule

would disregard the central premise of both *Chevron* and *Brand X*: that consistent with congressional intent in these cases, "it is for agencies, not courts, to fill statutory gaps." *Id.* at 983.

For all these reasons, we conclude that the holding of *Brand X* applies whether the judicial precedent at issue is that of a lower court or the Supreme Court. In sum, a court's—even the Supreme Court's—prior interpretation of a statute that an agency is empowered to administer forecloses an agency's reasonable construction only if the relevant judicial decision held the statute to be unambiguous. *See id.* at 984. Because the Supreme Court explicitly found 8 U.S.C. § 1231(a)(6) to be ambiguous, a contrary reasonable agency interpretation is not foreclosed in this case.

We recognize that this holding leads us to conflict with the results reached by the two other circuits to consider the Attorney General's revised construction of § 1231(a)(6). *See Tran v. Mukasey*, 515 F.3d 478 (5th Cir. 2008); *Thai v. Ashcroft*, 366 F.3d 790 (9th Cir. 2004). In those cases, the Fifth Circuit and Ninth Circuit reached a conclusion similar to that reached by the district court in this case: that the Attorney General's interpretation of § 1231(a)(6), as construed through 8 C.F.R. § 241.14, is unreasonable. *See Tran*, 515 F.3d at 485; *Thai*, 366 F.3d at 798–99. Both courts based their conclusions on the premise that the Supreme Court's decision in *Zadvydas* represented a final, definitive interpretation of 8 U.S.C. § 1231(a)(6). *See Tran*, 515 F.3d at 484 ("While it is

-15-

true that *Zadvydas* found that § 1231(a)(6) was ambiguous. . ., the Government ignores the fact that the *Zadvydas* court resolved this ambiguity by imposing a requirement that the detention last no longer than reasonably necessary to effectuate removal."); *Thai*, 366 F.3d at 798 ("[B]*ecause* Zadvydas *construed* § 1231(a)(6) to forbid the post-removal-period detention of an alien once removal is no longer reasonably foreseeable. . ., we hold that Thai's continued detention is not authorized under § 1231(a)(6).") (emphasis added).

We believe that the Fifth and Ninth Circuits erred by concluding that the Supreme Court could authoritatively and finally interpret § 1231(a)(6). *Brand X* makes clear that even after a court construes an agency's statute, "the agency may, consistent with the court's holding, choose a different construction, since *the agency remains the authoritative interpreter* (within the limits of reason) of such statutes." *Brand X*, 545 U.S. at 983. We therefore think *Tran* and *Thai* mistakenly focused on whether the Supreme Court's construction of 8 U.S.C. § 1231(a)(6) in *Zadvydas* authorized the kind of detention at issue here. Rather, the proper inquiry is whether the Attorney General's revised construction of § 1231(a)(6) is *reasonable*.

We are reassured in disagreeing with the Fifth and Ninth Circuit by the fact that neither court considered the Supreme Court's *Brand X* decision.[1] In contrast,

---

[1]The Ninth Circuit's decision in *Thai* predated *Brand X*. However, the court did not even address *Chevron* itself.

Judge Kozinski, dissenting from denial of rehearing *en banc* in *Thai*, anticipated *Brand X* to reach a conclusion similar to that which we reach today.

> The Supreme Court [in *Zadvydas*], confronted with a very broad statute, narrowed its scope to avoid unconstitutionality, but the Court's method of narrowing is not the only permissible one. The AG, pursuant to his statutory delegation of regulatory authority, has selected a different method of conforming the statute to the requirements of the Constitution . . . . *See Thai v. Ashcroft*, 389 F.3d 967, 971 (9th Cir. 2004) (Kozinski, J., dissenting from denial of *en banc*).

We conclude that *Tran* and *Thai* misconstrued the nature of the Supreme Court's decisions in *Zadvydas* and *Martinez*. In *Zadvydas*, the Supreme Court did not purport to "resolve" the statutory ambiguity in § 1231(a)(6) once and for all. Rather, the Court merely (properly, as we shall explain) declined to defer to an agency interpretation that raised serious constitutional doubts, and was therefore an unreasonable construction of Congress' intent. Because it owed the agency no deference, it was free to conclude that detention was authorized only for a six-month period. In no way, however, did the Court signal that its interpretation was the only reasonable construction of § 1231(a)(6). To the contrary, the Court specifically found the statute to be ambiguous. *See Zadvydas*, 533 U.S. at 697. Moreover, the Court explicitly recognized that its construction of the statute was not the only reasonable one possible. *See id*, 533 U.S. at 701 ("While an argument can be made for confining any presumption to 90 days . . . we recognize [a six month] period.")

Thus, notwithstanding the contrary results reached by the Fifth and Ninth Circuits, we conclude that the agency's construction of § 1231(a)(6) is owed *Chevron* deference to the extent that it is reasonable. To be sure, this reasonableness inquiry requires us to address whether, and in what manner, an agency's interpretive discretion is constrained by the canon of constitutional avoidance—questions we consider next.

### 2. Does the Constitutional Avoidance Canon Preclude Deference to the Agency Interpretation?

Mr. Hernandez-Carrera and Mr. Hernandez-Arenado contend that the canon of constitutional avoidance requires that we eschew deference to the agency's interpretation of § 1231(a)(6). The avoidance canon provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The aliens contend both that this principle "trumps Chevron" and operates to preclude the agency's interpretation of § 1231(a)(6) in this case. The government argues the opposite: that constitutional avoidance never precludes an agency's interpretation of a statute when *Chevron* deference is otherwise appropriate, and that regardless, constitutional avoidance does not preclude the agency's interpretation in this case. Aplt. Reply Br. 9. We think the

answer is in between. Although constitutional avoidance *can* operate to preclude agency interpretations which raise substantial constitutional doubts, the Attorney General's construction of 8 U.S.C. § 1231(a)(6) in 8 C.F.R. § 241.14 does not raise such doubts. Therefore, constitutional avoidance does not preclude the agency's interpretation of § 1231(a)(6) in this case.

It is well established that the canon of constitutional avoidance does constrain an agency's discretion to interpret statutory ambiguities, even when *Chevron* deference would otherwise be due. In *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988), the Supreme Court applied the canon of constitutional avoidance to reject the National Labor Relations Board's ("NLRB") interpretation of an ambiguous statute that it was empowered to administer. *See id.* at 574–77. Although the Court recognized that the NLRB's interpretation "would normally be entitled to deference" under *Chevron*, it found that "the Board's construction of the statute, as applied in [that] case, pose[d] serious questions of the validity of [the statute] under the First Amendment." *Id.* at 575. As a result, the Court concluded that "[e]ven if [the NLRB's] construction of the Act were thought to be a permissible one" under *Chevron*, *id.* at 577, the Court was required to inquire as to whether there existed another permissible interpretation that did not raise substantial constitutional doubts. *See id.* at 575–77.

"Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001). Although the government claims that this principle does "serious violence to the separation of powers," it is, in fact, separation of powers that dictates the principle in the first place. Like *Chevron*, the canon of constitutional avoidance is "a means of giving effect to congressional intent, not of subverting it." *Clark v. Martinez*, 543 U.S. 371, 382 (2005). The canon follows not only from courts' prudential desire not to decide constitutional issues unnecessarily, but from the "assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Solid Waste Agency of N. Cook County*, 531 U.S. at 172–73. Just as *Chevron* reflects a judgment that Congress generally intends to empower an agency to resolve certain statutory ambiguities, the avoidance canon reflects a judgment that Congress does not typically intend to authorize agencies to fill in statutory gaps in a manner raising substantial constitutional doubts.

We think it would be helpful here to add a word about the interplay between the canon of constitutional avoidance and the framework of administrative deference codified in *Brand X*. It may well be that some ambiguous statutes are susceptible of only one interpretation that avoids constitutional doubts. In such a case, both agencies and courts are obligated to

-20-

interpret the statute in the one manner that does not raise a serious constitutional question. To the extent that a court unequivocally concludes that constitutional avoidance compels one, and only one, reading of a statute, such a holding would constitute "a judicial precedent holding that the statute unambiguously forecloses [a contrary agency interpretation], and therefore [would] contain[] no gap for the agency to fill." *Brand X*, 545 U.S. 967, 983 (2005). Indeed, this may be precisely the kind of possibility that Justice Stevens envisioned his *Brand X* concurrence—"a decision by [the Supreme Court] that would presumably 'remove' any pre-existing ambiguity" in a statute. *See id.* at 1003 (Stevens, J., concurring).

It will frequently be the case, however, that an ambiguous statute susceptible of one interpretation raising serious constitutional doubts will be open to other readings that raise no such doubts. When this is the case, a court's initial application of the avoidance canon to construe an ambiguous statute would not foreclose the agency from adopting a different reasonable interpretation, if that interpretation also avoided the constitutional concerns. Likewise, if an agency initially construed a statute in a manner raising constitutional doubts—an interpretation that *Zadvydas* makes clear that a court would be right to reject—this would not foreclose the agency from later construing the statute in a different manner that avoids those doubts. In such a case, the later agency interpretation is due deference to the extent that would otherwise be appropriate

-21-

under the *Chevron* framework, even if it conflicts with an intermediate judicial construction of the statute that applied the canon of constitutional avoidance.

We therefore conclude that even after a court has construed a statute to avoid constitutional doubts, an agency remains free to interpret the same statute in a different manner so long as its subsequent interpretation is reasonable and avoids serious constitutional questions. A court's prior judicial construction of a statute, applying the avoidance canon, precludes an alternative agency construction only when no alternative, reasonable construction would avoid constitutional doubts. In that case the only "permissible" construction is the reading which does not provoke a serious constitutional question. In the ordinary case, however, courts should review a new agency interpretation afresh to determine whether the agency's reading sufficiently avoids raising constitutional doubts, such that it ought to be entitled to deference.

### 3. Does the Agency's Interpretation of § 1231(a)(6) Raise Serious Constitutional Doubts?

We thus come finally to the question of whether the agency's construction of 8 U.S.C. § 1231(a)(6), as codified in 8 C.F.R. § 241.14, avoids raising serious constitutional doubts. In the context of this case, this demands an inquiry into whether the Attorney General's revised construction of the scope and nature of his authority to detain aliens under § 1231(a)(6) comports with due process. Because we find that the substantive limitations built into the Attorney General's power to

detain aliens beyond the removal period, as well as the procedural protections provided in such cases, are sufficient to satisfy due process, we conclude that the agency's construction of § 1231(a)(6) no longer raises serious constitutional doubts.

Although freedom from detention "'has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action,' that liberty interest is not absolute." *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997) (internal citation omitted). Even in the civil context, a person's "constitutionally protected interest in avoiding physical restraint may be overridden," whether that person is an alien or a citizen. *Id.* at 356. Although there is no one formulation that signals when a civil detention scheme is permissible, those schemes which comport with due process typically apply narrowly to a small segment of particularly dangerous individuals and include meaningful procedural protections. *See generally Zadvydas*, 533 U.S. at 690–92. To be sure, "a finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment." *Hendricks*, 521 U.S. at 358. In cases in which preventative detention is of potentially indefinite duration, and where an individual is being detained because he is dangerous to himself or his community, due process demands the presence of "some other special circumstance, such as mental illness, that helps to create the danger." *Zadvydas*, 533 U.S. at 691. But where such "special and narrow

-23-

circumstances" are present, the government's interest in preventing harm "outweighs the 'individual's constitutionally protected interest in avoiding physical restraint'" *Id.* at 690 (quoting *Hendricks*, 521 U.S. at 346.)

Bearing this framework in mind, we consider the agency interpretation reviewed by the Supreme Court in *Zadvydas* and *Martinez*, as well as the agency's revised construction of § 1231(a)(6) before us today. In *Zadvydas*, the government argued that by the clear terms of § 1231(a)(6), Congress did not place a "limit on the length of time beyond the removal period that an alien who falls within one of the § 1231(a)(6) categories may be detained." *Zadvydas*, 533 U.S. at 689. Far from limiting the Attorney General's detention authority to "a small segment of particularly dangerous individuals," *see Hendricks*, 521 U.S. at 368, this reading would have authorized the detention of *any* removable alien under § 1231(a)(6), without regard to an alien's dangerousness or special characteristics. *See Zadvydas*, 533 U.S. at 691. As the Supreme Court pointed out, this construction suggested, at its limits, that Congress had authorized the Attorney General to permanently detain an alien guilty only of a tourist visa violation. *Id.*

Moreover, under the government's reading of § 1231(a)(6) in *Zadvydas*, aliens would have been entitled only to minimal procedural protections. In particular, an alien would have borne the burden of proving that he was not dangerous; if the alien failed to establish his non-dangerousness, indefinite detention would follow. *See id.* at 691. The government proposed to justify the

-24-

scope of its detention power and the lack of procedural protections it would afford

on the grounds that "alien status itself can justify indefinite detention" and that

Congress had "plenary power" to create immigration law. *Id.* at 692, 695. The

Court rejected both arguments. It made clear that at least some aliens—those who

had already been admitted to the territory of the United States—are entitled to

certain constitutional protections. *See id.* at 693. Moreover, it concluded that

Congress' plenary power to create immigration law was subject to constitutional

limits. *See id.* at 695. As a result, the Attorney General's construction of §

1231(a)(6) to authorize indefinite detention in the ordinary case was

constitutionally suspect.

In *Clark v. Martinez*, the government relied on the same construction of

1231(a)(6) that had been rejected in *Zadvydas*.[2] The government attempted to

distinguish *Zadvydas* by arguing that the constitutional problems with interpreting

§ 1231(a)(6) to authorize indefinite detention for admitted aliens were not present

in the case of aliens who have never been admitted. Although the Court

acknowledged that this might have been correct, it held that its earlier construction

_____

[2]Although 8 C.F.R. § 241.14 had been promulgated by the time of *Martinez*,
it was not at issue in that case. Both aliens before the Supreme Court in *Martinez*
were detained by the INS before 2000 pursuant to governing regulations at that
time. *See Zadvydas*, 533 U.S. at 685–86. They were detained well before the
Attorney General's adoption of 8 C.F.R. § 241.14 and even before *Zadvydas*
itself. The only question before the Court in *Martinez* was whether the Court's
holding in *Zadvydas* as to one class of aliens in § 1231(a)(6) (previously admitted
aliens subsequently ordered removed) applied equally to the other classes in
1231(a)(6) (inadmissible or criminal aliens).

of § 1231(a)(6)'s ambiguous language applied to each class of alien governed by the statute. *Martinez*, 543 U.S. at 380.

In both *Zadvydas* and *Martinez*, the only agency interpretation to which the Court was asked to defer was one authorizing indefinite detention for every removable alien covered by § 1231(a)(6) and providing minimal procedural protection. Applying the canon of constitutional avoidance, the Court concluded that Congress had not vested the Attorney General with such a constitutionally problematic detention authority. The Attorney General's revised reading of § 1231(a)(6) before us today, finalized through notice-and-comment rulemaking, avoids those constitutional concerns. Bearing the Court's guidance in *Zadvydas* in mind, the Attorney General now interprets § 1231(a)(6) to authorize detention beyond the removal period only in limited special circumstances. *See* 8 C.F.R. § 241.14(a) ("The Service may invoke the procedures of this section in order to continue detention of particular aliens *on account of special circumstances* . . . .") (emphasis added). Detention beyond the removal period is authorized only in situations where the government's interest in an alien's continued detention is particularly strong: in the cases of (1) aliens with a highly contagious disease that is a threat to public safety; (2) aliens detained on account of serious adverse foreign policy consequences of release; (3) aliens detained on account of security or terrorism concerns; and (4) aliens determined to pose a special danger to the public. 8 C.F.R. § 241.14(b–d), (f). Therefore, in contrast to the expansive scope

-26-

of ICE's detention authority advanced by the government in *Zadvydas*, the Attorney General has now interpreted § 1231(a)(6) only to authorize continued detention for a "small segment of. . .individuals" whose release would particularly endanger the public's health or safety, 8 C.F.R. § 241.14(b), (d), (f), or the nation's foreign relations. 8 C.F.R. § 241.14(c). *See Hendricks*, 521 U.S. at 368.

Moreover, the Attorney General has substantially enhanced the evidentiary requirements imposed on the agency and the procedural protections available to an alien before he can be detained because he poses a special danger under 8 C.F.R. § 241.14(f). First, an alien can be detained under this subsection only upon the finding that he has: (1) previously committed one or more crimes of violence as defined in 18 U.S.C. § 16; that (2) due to a mental condition or personality disorder and behavior associated with that condition or disorder, the alien is likely to engage in acts of violence in the future; and (3) no conditions of release can reasonably be expected to ensure the safety of the public. This directly responds to the *Zadvydas* Court's guidance that "[i]n cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger." *Zadvydas*, 533 U.S. at 691.

Equally importantly, the burden of proof is now on the agency to prove dangerousness, rather than on the alien to show non-dangerousness. In order to continue detention beyond the removal period because an alien poses a special

danger to the public, the government must first demonstrate that there is "reasonable cause to go forward with a merits hearing." 8 C.F.R. § 241.14(h). The alien is provided with written notice of the hearing and his rights, as well as a statement summarizing the agency's factual basis for continuing detention. 8 C.F.R. § 241.14(g)(1-3). The alien is also provided with a list of free legal services providers, and may be represented by an attorney or other representative of his or her choice in accordance with 8 C.F.R. § 292. 8 C.F.R § 241.14(g)(3)(i). At the hearing, the alien has the opportunity to examine evidence against him, present evidence in his behalf, and cross-examine witnesses or any authors of medical or mental health reports used as a basis for his continued detention. 8 C.F.R. § 241.14(g)(3)(i-iv). If ICE can show reasonable cause, a merits hearing is scheduled. 8 C.F.R. § 241.14(h)(3).

At the merits hearing, the agency has the burden of proving "special danger" by clear and convincing evidence. 8 C.F.R. § 241.14(i)(1). If the IJ determines that continued detention is warranted, ICE is responsible for providing an "ongoing, periodic review of the alien's continued detention," to determine whether changed circumstances warrant his immediate release. 8 C.F.R. § 241.14(k)(1). At the alien's request, the government will undertake a review of his case as frequently as once every six months. 8 C.F.R. § 241.14(k)(2–3).

Mr. Hernandez-Carrera and Mr. Hernandez-Arenado raise both substantive and procedural due process challenges to the regulations authorizing their

continued detention. We are confident, however, that due process is satisfied here. As an initial matter, we note that it is not at all clear that removable aliens benefit from precisely the same advantages of due process as do citizens or lawful permanent resident aliens. To be sure, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. However, the nature of the protection an alien is due "may vary depending upon status and circumstance." *Id.* at 694. "The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship, or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification." *Matthews v. Diaz*, 426 U.S. 67, 78 (1976).

Regardless of the precise nature of the protections that removable aliens are entitled to, we find Mr. Hernandez-Carrera's and Mr. Hernandez-Arenado's due process arguments unconvincing. The aliens first argue that the agency should be required to prove dangerousness beyond a reasonable doubt, rather than by clear and convincing evidence. However, even in a case involving citizens, a unanimous Supreme Court has upheld the use of a clear and convincing evidence standard in an indefinite civil commitment proceeding. *Addington v. Texas,* 441 U.S. 418, 432 (1979). The Court noted that given the uncertainties of psychological diagnosis, a reasonable doubt standard might "impose a burden that

the state cannot meet," and that a clear and convincing evidence standard was sufficient to satisfy due process. *Id.* at 432-33. We cannot think a higher standard is constitutionally compelled in the context of aliens subject to exclusion and deportation orders.

Next, the aliens contend that the regulations are constitutionally deficient because they do not, on their face, require the government to offer psychiatric treatment. However, Mr. Hernandez-Carrera and Mr. Hernandez-Arenado point to no evidence that aliens detained pursuant to 8 C.F.R. § 241.14 do not receive treatment. In fact, the record shows that the government attempted to provide treatment to both appellees. The IJ concluded, in agreement with mental expert testimony, that Mr. Hernandez-Carrera "refused to take his medication," even when "in the highly structured environment of the medical ward in the prison." App. 118. Indeed, this finding was central to the IJ's conclusion that no conditions of release could reasonably be expected to ensure the public's safety. *See* App. 118-119. Likewise, the IJ in Mr. Hernandez-Arenado's case noted that Mr. Hernandez-Arenado had refused to take part in group therapy and continued to reject treatment because of his "deep seated belief that his [pedophilic] actions are not inappropriate." App. 131. In addition, the Department of Health Services expert testified on cross-examination before the IJ that there was no cure for pedophilia, App. 131; due process surely does not require the provision of treatment for an untreatable mental condition. *See Hendricks*, 521 U.S. at 365–66

(noting that due process would present no barrier to the civil detention of pedophiles, assuming pedophilia was not amenable to treatment). In the absence of any evidence that suggests the government would withhold treatment from an alien amenable to it, we decline Mr. Hernandez-Carrera's and Mr. Hernandez-Arenado's invitation to read 8 C.F.R. § 241.14 as rejecting the possibility of treatment for detained aliens.[3]

Next, Mr. Hernandez-Arenado and Mr. Hernandez-Carrera contend that 8 C.F.R. § 241.14(f) does not allow for the oversight of an Article III judge. However, as this case illustrates, aliens who believe that their continued detention is unlawful may challenge ICE's determination by seeking a writ of habeas corpus in federal court. This is sufficient to satisfy the requirements of the Due Process Clause. "The writ of habeas corpus has always been available to review the legality of Executive detention," and both "[b]efore and after the enactment in 1875 of the first statute regulating immigration, the jurisdiction [of federal courts to grant the writ] was "regularly invoked on behalf of noncitizens, particularly in the immigration context." *I.N.S. v. St. Cyr*, 533 U.S. 289, 305 (2001). Thus, it has long been the case that "when the record shows that a commissioner of immigration is exceeding his power, [an] alien may demand his release upon

---

[3]Our conclusion makes it unnecessary to determine whether the government would be required to offer treatment as a matter of due process in a situation where effective treatment was available and an alien was amenable to treatment.

*habeas corpus*." *Id.* at 306 (quoting *Gegiow v. Uhl*, 239 U.S. 3, 9 (1915)). Due process requires no more.

Finally, Mr. Hernandez-Carrera and Mr. Hernandez-Arenado argue that due process is violated because the regulations provide "no right to a jury, no court-appointed counsel at government expense, no court-funded experts for the defense." Aple. Br. 26. First, we note that this case does not require us to decide whether the government must provide counsel to aliens detained under § 1231(a)(6). "A plaintiff may challenge a statute or regulation on an as-applied basis 'only insofar as it has an adverse impact on his own rights.'" *United States v. Friday*, 525 F.3d 938, 951 (10th Cir. 2008) (quoting *County Court of Ulster County v. Allen*, 442 U.S. 140, 155 (1979). Here, because both Mr. Hernandez-Carrera and Mr. Hernandez-Arenado have been represented by counsel throughout detention proceedings before the IJ as well as in federal court, they do not have standing to claim an "adverse impact" from any alleged deficiency in the access to counsel provided under the statute.

Likewise, Mr. Hernandez-Carrera and Mr. Hernandez-Arenado cannot prevail on a facial constitutional challenge on this score. While we have left undecided whether a plaintiff making a facial challenge must "establish that *no set of circumstances* exists under which the Act would be valid," *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 n.5 (10th Cir. 2006) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added)), it is clear a litigant cannot

prevail in a facial challenge to a regulation or statute unless he at least can show that it is invalid "in the vast majority of its applications." *Friday*, 525 F.3d at 950 n.6. Here, the aliens have not done so. Under 8 C.F.R. § 241.14(g)(3)(i), an alien "shall be provided with a list of free legal services providers, and may be represented by an attorney or other representative of his or her choice." This alone suggests that many aliens will have access to legal counsel. Even assuming counsel was required—something we do not here decide—Mr. Hernandez-Carrera and Mr. Hernandez-Arenado have not shown that the government has failed to provide it in "the vast majority" of cases. Thus, they cannot sustain a facial challenge on this ground.

We likewise reject the aliens' claims of right to juries and experts. In a civil commitment proceeding, "state power is not exercised in a punitive sense." *Addington*, 441 U.S. at 428. Accordingly, both the standards of proof and the constitutional rights applicable in the case of civil commitment are distinct from those available in a criminal proceeding. *See, e.g.*, *Allen v. Illinois*, 478 U.S. 364 (1986) (finding that the Fifth Amendment guarantee against self-incrimination in criminal cases is inapplicable to civil commitment proceedings). The Sixth Amendment right to jury trial, limited to "criminal prosecutions," does not extend to civil commitment proceedings. *See United States v. Salahar*, 917 F.2d 1197, 1205–06 (9th Cir. 1990). Finally, the aliens provide no support for the claim that ICE is obligated to provide aliens with their own court-funded experts. We note,

however, that both aliens had access to experts in this case, as both submitted psychiatric expert reports before the IJ.

We therefore conclude both that the Attorney General's interpretation of 8 U.S.C. § 1231(a)(6) satisfies due process. Because the Attorney General's statutory interpretation raises no serious constitutional question, and therefore represents a "reasonable" interpretation of the statute, it is entitled to *Chevron* deference.

### III. CONCLUSION

For the foregoing reasons, we find that the agency's revised interpretation of § 1231(a)(6) is reasonable, and therefore owed *Chevron* deference. The Attorney General's construction of 8 U.S.C. § 1231(a)(6), as interpreted in 8 C.F.R. § 241.14 avoids the constitutional and interpretive problems recognized in *Zadvydas* and *Martinez*. Unlike in *Zadvydas*, the Attorney General is no longer advancing a construction of § 1231(a)(6) raising serious constitutional doubts. Nor is he arguing that the Court's opinion in *Zadvydas* itself can be read to authorize indefinite detention for some § 1231(a)(6) aliens while simultaneously only permitting limited detention for others. *See Martinez*, 543 U.S. 380–81. Rather, the Attorney General's new construction applies equally to each class of alien listed in § 1231(a)(6). He has therefore avoided all of the deficiencies with his early interpretation. Whether or not we think the Attorney General's interpretation is the "best" one is immaterial. *See Chevron*, 467 U.S. at 843 n.11. Separation of

-34-

powers principles dictate that we defer to the Attorney General's construction of the statute so long as it is reasonable.

The Attorney General's interpretation of 8 U.S.C. § 1231(a)(6) reads Congress to have authorized the detention beyond ninety days of limited classes of aliens—including those who are particularly dangerous, mentally ill, and cannot be released without jeopardizing the public's safety—so that they need not be released into the general population only because no other country will accept them. Because his interpretation is eminently reasonable, it is one to which we owe deference.

We therefore **VACATE** the district court's order granting the writ of habeas corpus to Mr. Hernandez-Carrera and Mr. Hernandez-Arenado, and **REMAND** the case to the district court for further proceedings not inconsistent with this opinion.